State v. Redmon, 134 Wis. 89.

---

STATE vs. REDMON.     (Two cases.)

*November 30—December 13, 1907.*

*Constitutional law: Purposes of government: Legislative power: Express and implied limitations: Police power: Extent: Reasonable regulations: Departments of government: Legislative and judicial functions: Public interests: Declaration of legislative purpose: Sleeping-cars: Regulation of use of berths: Public health and comfort: Appropriation of private property.*

1. The general declaration in the constitution of the purposes of civil government is a limitation upon legislative power, designed, in part at least, to prevent clearly unreasonable enactments restricting natural private rights.

2. Legislation under the police power, as in any other field, is subject to constitutional limitations, some of which are expressed and others implied.

3. Police regulations which are reasonable are not inhibited by the constitution though invading its letter, since the exercise of the police power is so essential to the public welfare that it is presumed that such exercise within reasonable limits was not intended to be prohibited, but on the contrary guaranteed by the general declared purposes of civil government and the manifest purpose of the constitution.

4. It is a judicial function to determine the proper subjects for police regulations and a legislative function to determine, primarily, the expediency of regulation and the character thereof subject to judicial supervision to the extent of determining, in cases as they arise, whether the boundaries of reason have been so clearly exceeded as to violate some constitutional prohibition, express or implied; the judgment of the legislature being controlling unless it appears beyond reasonable controversy that the interference is unreasonable.

5. The police power extends to the enactment of all laws which in contemplation of the constitution promote the public welfare. "It has been not inaptly termed 'the law of necessity.'"

6. The doctrine that the police power is a law of necessity may well be said to furnish the key to what is within and what is without the boundaries of such power; not that a police regulation to be legitimate must be an absolute essential to the public welfare, but that the exigency to be met must so concern such welfare as to suggest, reasonably, necessity for legislative remedy, the legislature to be the primary judge and the supreme judge as well as to interferences not so unreasonable as to be excessive beyond reasonable controversy.

7. The inquiries as to an enactment respecting its legitimacy include these: "Does a danger exist? Is it of sufficient magnitude? Does it concern the public? Does the proposed measure tend to remove it? Is the restraint or requirement in proportion to the danger? Is it possible to secure the object sought without impairing essential rights and principles?" the judgment of the legislature to be taken as correct unless it appears to be wrong beyond reasonable controversy.

8. "To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference, and . . . that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

9. A legislative declaration respecting the character of a law, as that its purpose is to promote public health, is not absolutely

State v. Redmon, 134 Wis. 89.

binding on the courts. It is their function to determine the real intent of the law and, if its ostensible is not the real purpose, to give effect to the constitution by condemning the enactment.

10. A law providing that the upper berth in a sleeping-car shall, when unoccupied, at the option of the occupant of the lower berth, be closed, is not for the promotion of public health and comfort in the judgment of the legislature, in that the option is given in each instance where the regulation is applicable to say whether it shall operate or not, manifestly suggesting that it is for private rather than for public interests.

11. A law absolutely giving to the occupant of a lower berth in a sleeping-car control, at his option, of the upper berth in case of its not being occupied, is an unconstitutional appropriation of the property of one for the benefit of another, and an infraction of several constitutional safeguards.

12. The legislature cannot, properly, by police regulations deal with a matter not in reason forming a proper subject therefor nor deal with a proper subject by means which are clearly unreasonable.

13. If it were legitimate to give the occupant of a lower berth in a sleeping-car control of the upper berth in case of its not being occupied, it would not be reasonable to confer such control by confiscating for his benefit the use of such berth.

[Syllabus by MARSHALL, J.]

REPORTED from the municipal court of Brown county: N. J. MONAHAN, Judge. *Questions answered in the negative.*

Reports in two prosecutions under sec. 1636*p*, Stats. (Laws of 1907, ch. 266).

The first action was for a violation of such chapter September 5, 1907, and the second for a violation thereof August 26, 1907. The person whose rights under such law were violated in the latter was a passenger between points within the state, and the one in the former was an interstate passenger.

The report shows that defendant was convicted in each case in due form of law, and the existence of all circumstances necessary to raise the question of whether the enactment, supposed to warrant the prosecution, is constitutional. The purpose of the report is to obtain a determination of such question. These facts with others are in substance stated: The

sleeping-car in question was divided into a stateroom, a smoking room, and twelve sections, each of such sections containing a double upper and double lower berth arranged in the usual way common to ordinary Pullman sleeping-cars. The price charged for a berth varied somewhat according to distance and time of use. The price in the first case was $1.50 and in the second $2. Prior to the passage of the law it had been customary, upon making up the lower berth for use of a customer, to let down the upper berth, whether it had been theretofore engaged or not, and to prepare it, in whole or in part, for occupancy and to use it for sleeping or other purposes. The complainant in each case engaged and paid for a double lower berth and ordered the accused, who was the porter of the car, to leave the upper berth closed, since it had not been sold and there was no one to occupy it. The porter nevertheless, following the usual custom, under orders from his employer let down the upper berth, notifying the complainant that he was required to do that unless such berth was paid for.

The law in question is as follows:

"An act . . . relating to the health and comfort of occupants of sleeping-car berths.

"The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:

"1. Whenever a person pays for the use of a double lower berth in a sleeping-car, he shall have the right to direct whether the upper berth shall be open or closed, unless the upper berth is actually occupied by some other person; and the proprietor of the car and the person in charge of it shall comply with such direction.

"2. Any person or corporation violating the provisions of this act shall be punished by imprisonment in the county jail not more than six months, or by a fine not exceeding one hundred dollars."

For the plaintiff there was a brief by the *Attorney General* and *Russell Jackson,* deputy attorney general, and oral argu-

ment by *Mr. Jackson.* They contended, *inter alia,* that the real object of the police power, and that indeed which in its broad sense includes every instance of its exercise, is the securing of the general welfare, comfort, and convenience of the citizen. The police power may be exercised for the public *convenience* with regard to a business affected with a public interest, such as railroad and telegraph companies, that have no reference to health, morals, or safety, but simply to public *convenience.* Freund, Police Power, secs. 116, 377, 398; *Lake S. & M. S. R. Co. v. Ohio,* 173 U. S. 285, 297; *Central U. Tel. Co. v. Swoveland,* 14 Ind. App. 341; Calvert, Reg. of Comm. 86; *Atl. C. L. R. Co. v. N. C. Corp. Comm.* 206 U. S. 1; *Gladson v. Minnesota,* 166 U. S. 427; *Railroad Co. v. Fuller,* 17 Wall. 560; *Western U. Tel. Co. v. James,* 162 U. S. 650; *Western U. Tel. Co. v. Pendleton,* 122 U. S. 347. Under the police power the state can interfere whenever the public interests demand it, and in this particular a large discretion is necessarily vested in the legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. 22 Am. & Eng. Ency. of Law (2d ed.) 936; *Lawton v. Steele,* 152 U. S. 133, 136; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 519; *State ex rel. Ornstine v. Cary,* 126 Wis. 135, 141. The police power of a state cannot legitimately be exerted so as substantially to prohibit or unnecessarily burden interstate commerce. Interference with the commercial power of the federal government to be unlawful must be *direct,* and not the mere *incidental* effect of enforcing the police powers of the state. *Louisiana & N. R. Co. v. Kentucky,* 183 U. S. 503, 519; Calvert, Reg. of Comm. 91, 92; *Austin v. Tennessee,* 179 U. S. 343; *Field v. Barber A. P. Co.* 194 U. S. 618, 623; *Smith v. Alabama,* 124 U. S. 465; *Sherlock v. Alling,* 93 U. S. 99, 102, 103; 7 Cyc. 446, and cases cited; *Peik v. C. & N. W. R. Co.* 94 U. S. 164; *Western U. Tel. Co. v. James,* 162 U. S. 650; *Connell v. Western U.*

*Tel. Co.* 108 Mo. 459; *New York, N. H. & H. R. Co. v. New York,* 165 U. S. 628; 12 Rose's Notes, 946.

*H. O. Fairchild,* for the defendant, contended, *inter alia,* that the act in question is a regulation of commerce between the states, which is national in its character, requiring uniformity throughout all the states, and therefore within the exclusive power of Congress under art. I, sec. 8, Fed. Const. (1) The commerce between the states includes the transportation of persons as well as freight, and the regulation of such commerce includes all the instrumentalities by which it is carried on, including the cars in and by which passengers and freight are transported. *Welton v. Missouri,* 91 U. S. 275, 280; *Hopkins v. U. S.* 171 U. S. 578, 597; *U. S. v. Swift & Co.* 122 Fed. 529; *Comm. v. Hogan, McM. & T. Co.* (Ky.) 74 S. W. 737. (2) The fact that the cars in which the persons or freight are transported are owned by another than the carrier, or that their use in transporting passengers between states is held under lease or other arrangement between the carrier and the owner, as in this case, cannot affect the question whether they are instruments of commerce. Their use as such, and not their particular ownership, determines their character and status as such instrumentalities. *Pickard v. Pullman S. C. Co.* 117 U. S. 34, 36, 45–47; *Chicago, St. L. & N. O. R. Co. v. Pullman S. C. Co.* 139 U. S. 79, 90; *Johnson v. South. Pac. Co.* 196 U. S. 1, 21, 22; *Pennsylvania Co. v. Roy,* 102 U. S. 451, 456–57; *Bowman v. C. & N. W. R. Co.* 125 U. S. 465, 485; *Davis v. C., C., C. & St. L. R. Co.* 146 Fed. 403, 409; *Duval v. Pullman P. C. Co.* 62 Fed. 265; *Barrow S. S. Co. v. Kane,* 88 Fed. 197; *Louisville & N. R. Co. v. Dies,* 91 Tenn. 177, 181; *Louisville, N. & G. S. R. Co. v. Katzenberger,* 84 Tenn. (16 Lea) 380; *Cleveland, C., C. & I. R. Co. v. Walrath,* 38 Ohio St. 461; *Jones v. St. Louis S. S. R. Co.* 125 Mo. 674; *Thorpe v. N. Y. C. & H. R. R. Co.* 76 N. Y. 402, 407; *Dwinelle v. N. Y. C. & H. R. R. Co.* 120 N. Y. 118, 122, 123. (3) There is no doubt

that "the authority to regulate commerce with foreign nations and among the states" includes within its compass powers which can only be exercised by Congress, as well as powers which, from their nature, can best be exercised by the state legislatures. *Crandall v. Nevada,* 6 Wall. 35, 42; *County of Mobile v. Kimball,* 102 U. S. 691, 697; *Bowman v. C. & N. W. R. Co.* 125 U. S. 465. (a) Among those powers which may best be exercised by the states are the regulation of police, quarantine, and inspection laws; policing the harbors; the improvement of navigable channels; the regulation of wharves, piers, and docks; the construction of dams and bridges across navigable waters of the state; the establishment of ferries; the adoption and enforcement of police regulation for the promotion of the public health, safety, comfort, and convenience. *Covington & C. B. Co. v. Kentucky,* 154 U. S. 204, 210, 211; *Manigault v. Springs,* 199 U. S. 473; *Chicago, M. & St. P. R. Co. v. Solan,* 169 U. S. 133; *Mo., K. & T. R. Co. v. Haber,* 169 U. S. 613; *Bowman v. C. & N. W. R. Co.* 125 U. S. 465; *Smith v. Alabama,* 124 U. S. 465. (b) But even those powers over such commerce which may best be exercised by the states may also be exercised by Congress, and when so exercised by Congress its regulations supersede those of the state in so far as they cover the particular subject. *Covington & C. B. Co. v. Kentucky,* 154 U. S. 204; *Gulf, C. & S. F. R. Co. v. Hefley,* 158 U. S. 98. (c) In such latter case the failure of Congress to legislate on the subject, or to cover the whole subject, leaves state legislation on the subject, either entirely or to the extent not covered by the regulation of Congress, operative so long as such failure of Congressional legislation continues. *Sherlock v. Alling,* 93 U. S. 99; *Wabash, St. L. & P. R. Co. v. Illinois,* 118 U. S. 557; *Louisville, N. O. & T. R. Co. v. Mississippi,* 133 U. S. 587; *Hennington v. Georgia,* 163 U. S. 299; *New York, N. H. & H. R. Co. v. New York,* 165 U. S. 628; *Chicago, M. & St. P. R. Co. v. Solan,* 169 U. S. 133. (d) When, however, the subject

to which the power of regulation applies is national in character, or of such a nature as to admit and require uniformity of regulation, affecting alike all the states, the power is in its nature exclusively in Congress and the states cannot act in such case. *Cooley v. Board of Wardens,* 12 How. 299; *Hall v. DeCuir,* 95 U. S. 485, 497; *Walling v. Michigan,* 116 U. S. 446, 455; *Robbins v. Shelby Co. Tax. Dist.* 120 U. S. 489; *Philadelphia & S. S. Co. v. Pennsylvania,* 122 U. S. 326; *Atl. & Pac. Tel. Co. v. Philadelphia,* 190 U. S. 160; *Easton v. Iowa,* 188 U. S. 220; *Davis v. C., C., C. & St. L. R. Co.* 146 Fed. 403, 412. (e) Whenever the subjects of regulation, instead of being of a local nature and affecting interstate commerce but incidentally, are national in character and admit of and require uniformity of regulation, the nonaction of Congress indicates its will that such commerce shall be free and untrammeled, and any action by the state attempting regulation will be invalid. *Welton v. Missouri,* 91 U. S. 275, 281; *County of Mobile v. Kimball,* 102 U. S. 691; *Brown v. Houston,* 114 U. S. 622; *Gloucester F. Co. v. Pennsylvania,* 114 U. S. 196, 204; *Walling v. Michigan,* 116 U. S. 446; *Smith v. Alabama,* 124 U. S. 465; *Bowman v. C. & N. W. R. Co.* 125 U. S. 465; *Brennan v. Titusville,* 153 U. S. 289, 302; *Covington & C. B. Co. v. Kentucky,* 154 U. S. 204; *Philadelphia & S. S. Co. v. Pennsylvania,* 122 U. S. 326, 336. (f) Congress having already before the passage of ch. 266, Laws of 1907 (sec. 1636*p,* Stats.), spoken on the subject of that act, so far as it relates to interstate transportation and traffic, clearly evincing its assumption of jurisdiction over the whole subject, the state act was therefore not only unauthorized, but its provisions, being in conflict with such acts of Congress, were invalid. Ch. 266, Laws of 1907 (sec. 1636*p,* Stats.), authorizes the taking of private property for private purposes, without the consent of or compensation to the owner, in violation of the Fourteenth Amendment of the federal constitution and of secs. 1, 9, art. I, of

the state constitution. Any restriction or interruption of the common and necessary use of property that destroys its value or strips it of its attributes, or to say that the owner shall not use his property as he pleases, *takes it,* in violation of the constitution. *Janesville v. Carpenter,* 77 Wis. 288; *Diana S. Club v. Lamoreux,* 114 Wis. 44; *In re Dancy D. Dist.* 129 Wis. 129; *Wynehamer v. People,* 13 N. Y. 378; *Pumpelly v. Green Bay Co.* 13 Wall. 166; *Mo. Pac. R. Co. v. Nebraska,* 164 U. S. 403; *Chicago, B. & Q. R. Co. v. Chicago,* 166 U. S. 226; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530; *Pearsall v. Eaton Co.* 74 Mich. 558; *Easton v. Boston, C. & M. R. Co.* 51 N. H. 504; *Hutton v. Camden,* 39 N. J. Law, 122; *People ex rel. Manhattan Sav. Inst. v. Otis,* 90 N. Y. 48; *Thompson v. Manhattan R. Co.* 130 N. Y. 360; *Callen v. Columbus Edison E. Co.* 66 Ohio St. 166, 64 N. E. 141; *Stevens v. State,* 2 Ark. 291; *Dixon v. People,* 168 Ill. 179; *Bailey v. People,* 190 Ill. 28; *In re Comingore,* 96 Fed. 552, 555; *Fears v. State,* 102 Ga. 274; *Slaughter-House Cases,* 16 Wall. 36, 127; *Harbison v. Knoxville I. Co.* 103 Tenn. 421; *Low v. Rees P. Co.* 41 Neb. 127; *State ex rel. Star Pub. Co. v. Associated Press,* 159 Mo. 410; *Staton v. Norfolk & C. R. Co.* 111 N. C. 278; *De Lauder v. Baltimore Co. Comm'rs,* 94 Md. 1; *First Nat. Bank v. Sarlls,* 129 Ind. 201; *Waters v. Wolf,* 162 Pa. St. 153; *Carlton v. Carlton,* 72 Me. 115; *Nat. Tel. News Co. v. Western U. Tel. Co.* 119 Fed. 294, 299; *Kuhn v. Common Council,* 70 Mich. 534. Everything which has an exchangeable value or is a subject of ownership is properly within the protection of the constitutional guaranties cited. *Burch v. McDaniel,* 2 Wash. Ter. 58; *B. & L. R. Co. v. S. & L. R. Co.* 2 Gray, 35; *Slaughter-House Cases,* 16 Wall. 36, 127; *In re Marshall,* 102 Fed. 323; *In re Fixen,* 102 Fed. 295; *Low v. Rees P. Co.* 41 Neb. 127; *Ritchie v. People,* 155 Ill. 98; *Stanton v. Lewis,* 26 Conn. 444; *Washington Co. v. Weld Co.* 12 Colo. 152; *Scranton v. Wheeler,* 179 U. S. 141; *Davidson v. New Orleans,* 96 U. S. 97; *Chicago, B. & Q. R..*

*Co. v. Chicago,* 166 U. S. 226; *Cole v. La Grange,* 113 U. S.
1; *Smyth v. Ames,* 169 U. S. 466; *Covington & C. T. R. Co.
v. Sanford,* 164 U. S. 578; *Chicago, M. & St. P. R. Co. v.
Minnesota,* 134 U. S. 418; *Mo. Pac. R. Co. v. Nebraska,*
164 U. S. 403; *Reagan v. Farmers' L. & T. Co.* 154 U. S.
362; *Dodge v. Mission Tp.* 107 Fed. 827, 833; *Janesville v.
Carpenter,* 77 Wis. 288; *Att'y Gen. v. Eau Claire,* 37 Wis.
400; *Att'y Gen. v. Old Colony R. Co.* 160 Mass. 62; *Wis.
W. Co. v. Winans,* 85 Wis. 26. It cannot be claimed that be-
cause the upper berth is not actually occupied by a person,
when the direction to close it is given by the purchaser of the
lower berth, it ceases, for that reason, to be the property of
the proprietor, to do with as he pleases—not to the injury of
others,—or that it may be confiscated by or for the occupant
of the lower berth. Farnham, Water & Water Courses, 16,
75; *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 112 Wis.
323, 332; *Luessen v. Oshkosh E. L. & P. Co.* 109 Wis. 94;
*Norton v. Peck,* 3 Wis. 714; *De Camp v. Bullard,* 159 N. Y.
450; *Diana S. Club v. Lamoreux,* 114 Wis. 44, 58. The act
under consideration also deprives the proprietor of sleeping-
cars of the freedom of contract, as well as of control, over his
own business and property, and therefore is in conflict with
the Fourteenth Amendment of the federal constitution and
sec. 9, art. I, of the state constitution. *State ex rel. Zillmer v.
Kreutzberg,* 114 Wis. 530; *Cooper Mfg. Co. v. Ferguson,* 113
U. S. 727; *Allgeyer v. Louisiana,* 165 U. S. 578; *U. S. v.
Joint T. Asso.* 171 U. S. 505; *People v. Williams,* 189 N. Y.
131; *Lochner v. New York,* 198 U. S. 45; *N. W. Nat. L. Ins.
Co. v. Riggs,* 203 U. S. 243; *Western T. Asso. v. Greensburg,*
204 U. S. 359; *Covington & C. T. R. Co. v. Sandford,* 164
U. S. 578; *State v. Chapman,* 69 N. J. Law, 464; *Ex parte
Steinman,* 95 Pa. St. 220; *O'Hara v. Stack,* 90 Pa. St. 477,
491; *Bailey v. People,* 190 Ill. 28. The act in question also
denies the equal protection of the laws and is invalid for that
reason under constitutional guaranties. *Black v. State,* 113

Wis. 205; *Janesville v. Carpenter*, 77 Wis. 288; *Anderton v. Milwaukee*, 82 Wis. 279; *State v. Julow*, 129 Mo. 163; *Gillespie v. People*, 188 Ill. 176; *Lake S. & M. S. R. Co. v. Smith*, 173 U. S. 684; *Cotting v. Kansas City S. Y. Co.* 183 U. S. 79. The act is not a valid exercise of the police power. (1) It goes without saying that no power is reserved to the states to invade or violate any power granted by the constitution to Congress exclusively; nor can any regulation on the part of a state be said to be within its police powers which does violence to any right of the citizen guaranteed or protected by any clause of the federal constitution. *Central of Ga. R. Co. v. Murphey*, 196 U. S. 194; *Lake S. & M. S. R. Co. v. Smith*, 173 U. S. 684; *State ex rel. Jones v. Froehlich*, 115 Wis. 32; *State ex rel. Mil. Med. Coll. v. Chittenden*, 127 Wis. 468; *Lafarier v. Grand Trunk R. Co.* 84 Me. 286; *Crowley v. Christensen*, 137 U. S. 86, 89; *Mugler v. Kansas*, 123 U. S. 623, 669; *California R. Co. v. Sanitary R. Works*, 199 U. S. 306; *State ex rel. Minneapolis v. St. Paul, M. & M. R. Co.* 101 Minn. 545, 108 N. W. 261. (2) While the exact scope of the police power is difficult of definition, yet it is sufficiently correct for the purpose of this inquiry to say that "it extends to and prohibits legislation regulating reasonably all matters appertaining to the life, limb, health, comfort, good morals, peace and safety of society; in short, to all which promotes the public welfare." *State ex rel. Mil. Med. Coll. v. Chittenden*, 127 Wis. 468; *Chicago, M. & St. P. R. Co. v. Milwaukee*, 97 Wis. 418; 22 Am. & Eng. Ency. of Law (2d ed.) 938, 939; *Huber v. Merkel*, 117 Wis. 355; *In re Theresa D. Dist.* 90 Wis. 301; *State ex rel. Zillmer v. Kreutzberg*, 114 Wis. 530; *Ex parte Quarg*, 149 Cal. 79, 84 Pac. 766; *Hume v. Laurel Hill Cem.* 142 Fed. 552; *Ruhstrat v. People*, 185 Ill. 133; *Niagara F. Ins. Co. v. Cornell*, 110 Fed. 816; *Application of Jacobs*, 98 N. Y. 98, 110; *Wright v. Hart*, 182 N. Y. 330; *Lawton v. Steele*, 152 U. S. 133; *Loan Asso. v. Topeka*, 20 Wall. 655; *Chicago, B. & Q. R. Co.*

*v. State ex rel. Omaha,* 47 Neb. 549; *State ex rel. Wyatt v. Ashbrook,* 154 Mo. 375; *Chicago v. Netcher,* 183 Ill. 104; *Ritchie v. People,* 155 Ill. 98. (3) The conduct enjoined by the act has no relation to the health and comfort of the public or even the individual occupants of a lower berth. *Wis. W. Co. v. Winans,* 85 Wis. 26, 39; *Priewe v. Wis. S. L. & I. Co.* 93 Wis. 534; *In re Morgan,* 26 Colo. 415; *Eden v. People,* 161 Ill. 296; *Bessette v. People,* 193 Ill. 334; *Ritchie v. People,* 155 Ill. 98; *People ex rel. Tyroler v. Wardens,* 157 N. Y. 116; *State ex rel. Douglas Co. v. Cornell,* 53 Neb. 556; 22 Am. & Eng. Ency. of Law (2d ed.) 938; *Chicago v. Netcher,* 183 Ill. 104; *Application of Jacobs,* 98 N. Y. 98; *People v. Havnor,* 149 N. Y. 195; *People v. Orange Co. R. C. Co.* 175 N. Y. 84; *Wright v. Hart,* 182 N. Y. 330; *Chicago, B. & Q. R. Co. v. State ex rel. Omaha,* 47 Neb. 549; *State ex rel. Wyatt v. Ashbrook,* 154 Mo. 375; *State v. Donaldson,* 41 Minn. 74; *State ex rel. Adams v. Burdge,* 95 Wis. 390; *Bankhead v. Brown,* 25 Iowa, 540, 545; *Noel v. People,* 187 Ill. 587; *Schaezlein v. Cabaniss,* 135 Cal. 466; *Harmon v. State,* 66 Ohio St. 249. If it should be held that the act in question is a regulation of intrastate traffic and would be valid as such, had its provisions been confined to such traffic, it is nevertheless invalid as to that case, even though every other objection fail, because a regulation of both interstate and intrastate commerce, and the parts are inseparable, and the void portion is the compensation for or the inducement to the valid portion. *Pollock v. Farmers' L. & T. Co.* 158 U. S. 601; *Gilbert-Arnold L. Co. v. Superior,* 91 Wis. 353; *Huber v. Martin,* 127 Wis. 412; *U. S. v. Reese,* 92 U. S. 214; *Trade-Mark Cases,* 100 U. S. 82; *Virginia Coupon Cases,* 114 U. S. 269, 305; *Baldwin v. Franks,* 120 U. S. 678; *People v. Orange Co. R. C. Co.* 175 N. Y. 84; *Wynehamer v. People,* 13 N. Y. 378; *U. S. v. Harris,* 106 U. S. 629; *Allen v. Pullman's P. C. Co.* 191 U. S. 171; *State v. Pullman's P. C. Co.* 64 Wis. 89; *Ballard v. Miss. C. O. Co.* 81 Miss. 507,

34 South. 533; *U. S. v. Ju Toy,* 198 U. S. 253; *Railroad Cos. v. Schutte,* 103 U. S. 118; *Sup'rs v. Stanley,* 105 U. S. 305; *State Freight Tax,* 15 Wall. 232; *Smiley v. Kansas,* 196 U. S. 447; 1 Lewis's Suth. Stat. Const. (2d ed.) §§ 296, 297.

MARSHALL, J. It is conceded that the legislation in question was an attempt to exercise the police power of the state which is inherent in sovereign authority under such limitations as exist in the national and state constitutions, and that if as a police regulation it is not legitimate it is not the law though possessing the form thereof. A legislative enactment approved by the executive and duly published is not necessarily a law or binding on any one in respect to his liberty, his business, or his property. It is such if it is susceptible of passing the judicial test of whether it is warranted by the fundamental law, which our constitutional system contemplates may be applied to all such enactments. Perhaps the thought sometimes expressed that the vital feature suggested, which every good law must possess, is not as fully appreciated by the law-making power as it ought to be, leading to infractions of some express limitation as well as that broad general restriction of legislative power contained in the declaration that

"All men are born equally free and independent, and have certain inherent rights; among these are life, liberty, and the pursuit of happiness; to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed."

Too much dignity cannot well be given to that declaration. That it was intended to cover a broad field not practicable to circumscribe by any specific limitation or limitations cannot well be doubted. This court has given thereto its proper place in unmistakable language, particularly in recent decisions. *Durkee v. Janesville,* 28 Wis. 464, 471; *State ex rel. Adams v. Burdge,* 95 Wis. 390, 70 N. W. 347; *State ex rel.*

*Kellogg v. Currens,* 111 Wis. 431, 435, 87 N. W. 561; *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 90 N. W. 1098; *State ex rel. Jones v. Froehlich,* 115 Wis. 32, 42, 91 N. W. 115; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 521, 107 N. W. 500.   Doubtless the fathers of the constitution foresaw the likelihood and danger of the security of personal rights, which the fundamental law was intended to firmly entrench with the judiciary as its efficient defender, being jeopardized at times by excessive regulation of the ordinary affairs of life, and with that in view incorporated in the fundamental law at sec. 22, art. I, that admonition so full of meaning:

"The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."

The idea is found expressed now and then, that the police power is something not dealt with or affected by the constitution, at least in any marked degree, which is a mistake hardly excusable.   The error suggested here and there, that the police power is "a sovereign power in the state, to be exercised by the legislature, which is outside, and in a sense above, the constitution (*Donnelly v. Decker,* 58 Wis. 461, 17 N. W. 389), or that a police regulation which is clearly a violation of express constitutional inhibition is legitimate, subject to a judicial test as to reasonableness . . . (Tiedeman, State & Federal Control, § 3), or that no police regulation, not condemned by some express constitutional prohibition, is illegitimate, or that legislation not so condemned is legitimate if the law-making power so wills, though it violates some fundamental principles of justice, or that the reasonableness of a police regulation, and whether it unjustly deprives the citizen of natural rights, is wholly of legislative concern (*Hedderich v. State,* 101 Ind. 564, 1 N. E. 47), and others of a similar character now and then found in legal opinions and text-books,

are highly misleading" and have been distinctly discarded by this court. *State ex rel. Milwaukee Med. Coll. v. Chittenden, supra.* As was there said, "If it were true that all police regulations are legitimate which are reasonable, and all are reasonable which the legislature so wills, the constitution as to very much of the field of civil government would be of no use whatever. The contrary has been the rule without any legitimate question since *Marbury v. Madison,* 1 Cranch, 137."

The following significant expressions of this court as to the constitutional limitations in the exercise of the police power leave nothing further to be said on the subject:

"As the police power imposes restrictions and burdens upon the natural and private rights of individuals, it necessarily depends upon the law for its support; and, although of comprehensive and far-reaching character, it is subject to constitutional restrictions. . . ." *State ex rel. Adams v. Burdge,* 95 Wis. 390, 398, 70 N. W. 347, 349.

"At this late day it cannot be doubted that this declaration of the purpose to be accomplished is to be construed as a limitation upon the powers given. By the preamble, preservation of liberty is given precedence over the establishment of government. It would be inconceivable that the people of Wisconsin, in establishing a government to secure the rights of life, liberty, and the pursuit of happiness, should by general grant of legislative power have intended to confer upon that government authority to wholly subvert those primary rights; and in this view it has been held by this court that legislative acts conflicting with that declared purpose are forbidden by the constitution, and must be denied efficacy by the courts." *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 532, 90 N. W. 1098, 1099.

"The police power has been wittily defined as the power to pass unconstitutional laws, and some utterances of courts have seemed to justify such conception. It is nevertheless erroneous. An act which the constitution clearly prohibits is beyond the power of the legislature, however proper it might be as a police regulation but for such prohibition."

*State ex rel. Jones v. Froehlich,* 115 Wis. 32, 42, 91 N. W. 115, 118.

"So legislation referring to police authority for legitimacy, like any other exercise of the law-making power, must bear the test of constitutional limitations, which will be found upon all sides. On the one side it may meet the barrier of an express prohibition; on another the implied prohibition of any law not in harmony with the all-prevailing purposes of the constitution; on another the implied inhibition involved in the declaration that 'the blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles.' " *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 521, 107 N. W. 500, 517.

Doubtless in most, if not all, of the instances above referred to where language was used descriptive of police authority, which, as indicated, are misleading, the ideas in the minds of the judicial writers were in the main, at least, correct, but the manner of expressing them was not altogether fortunate.

The police power is so obviously essential to the public welfare that it is presumed the framers of the constitution did not intend to prohibit its exercise where reasonably necessary therefor, though such exercise might invade the scope, viewing the language in the literal sense, of some fundamental prohibition, as that against taking property for public use without rendering just compensation therefor. So it is said that a law authorizing the destruction by public authority of private property without the owner's consent, where necessary to prevent the spread of a contagious disease, is legitimate not because the police power is above or superior to or not dealt with by the constitution, but because it was not intended to deal with the suggested situations by such express prohibition. Therefore the law is not to be regarded as a violation thereof, though if the field of reasonable necessity were exceeded that of the prohibition would be invaded. Up to the boundary between the two the police authority is not restricted by the

prohibition, while the existence of it is rather guaranteed by the general declaration breathing the dominant purpose of civil government. So a police regulation, correctly speaking, is no more legitimate than a law in any other field if it in fact violates any principle entrenched in the constitution.

What is this police power about which so much is said, and which is so commonly and, generally speaking, legitimately invoked as a justification for legislation regulating the affairs of life? In view of the multiplication of legislative enactments hedging the citizen about as to many of such affairs and in a manner quite novel as compared with former conditions, it is quite important that the character of that broad power and its limitations by the fundamental law should be as accurately understood as practicable.

Many attempts have been made to define police power. There is good reason to say that the multitude of such attempts with the many variations in phrasing the matter have not added very much to the simple expression, that it is the power to make all laws which in contemplation of the constitution promote the public welfare. That both defines the power and states the limitations upon its exercise, it being understood that it is a judicial function to determine the proper subject to be dealt with, and that it is a legislative function, primarily, to determine the manner of dealing therewith, but ultimately a judicial one to determine whether such manner of dealing so passes the boundaries of reason as to overstep some constitutional limitation, express or implied.

This court, in common with others, has said that the police power extends to legislation regulating, reasonably—that is, to an extent not entering the realms of the destructive,—all matters appertaining to the lives, limbs, health, comfort, good morals, peace, and safety of society. *Baker v. State,* 54 Wis. 368, 372, 12 N. W. 12; *State ex rel. Larkin v. Ryan,* 70 Wis. 676, 681, 36 N. W. 823; *State v. Heinemann,* 80 Wis. 253, 49 N. W. 818; *Bittenhaus v. Johnston,* 92 Wis. 588,

66 N. W. 805; *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561. Again this court said, by way of approval of expressions of standard authors and opinions in leading cases, the police power includes "all laws for the protection of life, limb, and health, for the quiet of the person and for the security of property." "All persons and property are subjected to all necessary restraints and burdens to secure the general comfort, health, and prosperity of the state." "It is co-extensive with self-protection and is not inaptly termed 'the law of necessity.' It is that inherent and plenary power in the state which enables it to prohibit all things hurtful to the comfort and welfare of society." *State ex rel. Adams v. Burdge,* 95 Wis. 390, 398, 70 N. W. 347. These and many other similar phrasings, meaning the same thing, are far from being entirely satisfactory. They are misleading to one who reads them without having in mind the idea that all legislative regulations of human affairs interfering with personal liberty or other private rights, to be legitimate, tested by constitutional limitations, must be reasonably for the public benefit.

It were better to always say that the police power extends to and permits legislation regulating reasonably matters appertaining to the public welfare, since anything beyond that must necessarily fall at the threshold of some constitutional defense. It is a great power, having more to do with the well-being of society than any other, yet one which if exercised autocratically would supersede some of the most cherished principles of constitutional freedom. It may be extended disastrously, or restrained and administered beneficially, according as the judiciary shall perform its constitutional functions. Confined within its legitimate field of reasonable regulation it is essential, as we have heretofore indicated, to the full accomplishment of the purposes of civil government.

There may be autocracy of the sovereign, whether the term is used in a personal sense or as representing the people in

the aggregate acting through their representatives. One might be quite as dangerous as the other without the restraints of a written constitution and an independent and courageous judiciary to stand guard at the boundaries thereof.

With our system the danger of destruction or impairment of inherent rights by well-meant but improvident legislation is too remote to be disturbing as to the future, for, as said in effect in *Marbury v. Madison*, 1 Cranch, 137, no enactment is controlling if the tribunal created by the constitution to pass upon its character cannot reasonably escape the conclusion that the paramount law condemns it.

With the foregoing general observations as to the character and limitations upon the police power we shall proceed to consider, respecting the law in question, these propositions; Is it a police regulation, laying aside for the purposes of the inquiry the question of whether it is within the constitutional field? Second, if it be such a regulation, is it outside the field of reasonable interference with private rights?

The ostensible purpose of the law, as indicated by its title, is to promote the "health and comfort of occupants of sleeping-car berths." Words were used in such title *ex industria*, seemingly, to give to the enactment, unmistakably, the character of a police regulation, but a law is not necessarily one to promote the public health and comfort of people generally, or of a legitimate class thereof, merely because such is its declared purpose.

As it is a judicial function to define the proper subjects for the exercise of police power (*Lake View v. Rose Hill C. Co.* 70 Ill. 191), it must be to decide, as to any enactment, whether it really relates to a legitimate subject, or under the guise of doing so violates rights of persons or property. The idea that all legislation is within the police power which the law-making authority determines to be so, and that all which might be within such power is within it if the legislature so determines, is, as we have seen, a heresy, and one

which was repudiated sufficiently for all time by the early decision, heretofore referred to, in *Marbury v. Madison, supra,* the American classic which first and conclusively defined the general character of the constitutional limitations and the relations of the legislature and the judiciary thereto and to each other. The doctrine there laid down more than a century ago in the unanswerable logic of Chief Justice MARSHALL has never been departed from, except accidentally, inconsiderately, or ignorantly.

These words of the supreme court of the United States, speaking by Mr. Justice HARLAN, in *Mugler v. Kansas,* 123 U. S. 623, 661, 8 Sup. Ct. 273, 297, express in a different form the spirit of the opinion in *Marbury v. Madison, supra:*

"The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

That states the law as it has been uniformly administered. Many examples might be given of like judicial treatment of the matter. We will rest the subject with one further citation. In *In re Jacobs,* 98 N. Y. 98, 110, an act declared, as in this case, to be for the promotion of the public health, was condemned as an unconstitutional interference with private rights, the court saying:

"It matters not that the legislature may in the title to the act, or in its body, declare that it is intended for the improvement of public health. Such a declaration does not conclude the courts, and they must yet determine the fact declared and enforce the supreme law."

It is not every enactment which will to some extent promote the public health, comfort, or convenience, which is legitimate. Otherwise the way would be open for legislative interference with the ordinary affairs of life to an extent destructive of many of the most valuable purposes of civil government. An expert on sanitation, or one on the manner of living best calculated to promote long and enjoyable life, who has become an enthusiast in his special study of the matter, could doubtless suggest a multitude of really, or apparently, good rules to be followed; the temperature of the air of sleeping rooms, the proper size of the rooms as regards the number of occupants, the arrangements for frequently changing the air by displacing that within for that without the habitation, the hours for sleeping, for retiring, and for arising, the amount and kind of food to eat, the proper number of meals per day, the proper admixture of solids and liquids and length of time for each meal, the amount and kind of exercise required, and other things too numerous to mention might be suggested for legislative interference, each with a provision for a severe penalty for its violation, with a division of the penalty, perhaps, between the informer and the public, till one would be placed in such a straight-jacket, so to speak, that liberty and the pursuit of happiness, the incentive to industry, to the acquirement and enjoyment of property,—those things commonly supposed to make a nation intelligent, progressive, prosperous, and great,—would be largely impaired and in some cases destroyed. That such an extreme would be regulation run mad and is quite improbable, 'tis true, but it would be possible without limitations of some sort, if a police law be conclusively legitimate merely because it promotes, however trifling in degree, public health, comfort, or convenience.

To take a view of a possible extreme running into the absurd is sometimes a most helpful method of illustrating that which must be regarded as false from its very absurdity.

Law can never legitimately go clearly beyond the boundaries of reason.

Illustrating the matter as above, in *Ex parte Jentzsch,* 112 Cal. 468, 472, 44 Pac. 803, 804, the court said:

"The spirit of a system such as ours is, therefore, at total variance with that which, more or less veiled, still shows in the paternalism of other nations. It may be injurious to health to eat bread before it is twenty-four hours old, yet it would strike us with surprise to see the legislature making a crime of the sale of fresh bread. . . . So, while the police power is one whose proper use makes most potently for good, in its undefined scope and inordinate exercise lurks no small danger to the republic. For the difficulty which is experienced in defining its just limits and bounds affords a temptation to the legislature to encroach upon the rights of citizens with experimental laws, none the less dangerous because well meant."

The doctrine that the police power is really a law of necessity forms the key, it would seem, with which to unlock the mysteries, so far as practicable, of what is within and what is without the limits of such power. Not that a police regulation, in form or pretense, to be one in fact must supply some absolute essential to the public welfare, but that the exigency to be met must so concern such welfare, be sufficiently vital thereto, as to suggest some reasonable necessity for a remedy affordable only by a legislative enactment, as to efficiently invite public attention thereto, it being regarded as a legislative function to primarily pass upon the matter. No more definite rule can be well worked out except as it may be evolved by the process of inclusion and exclusion in the treatment of cases as they arise.

Illustrations of the necessary degree of exigency are cases of the deprivation of liberty by isolation to prevent the spread of contagious diseases, deprivation of property without the consent of the owner and without rendering a compensation therefor, as the destruction of animals in case of

their being afflicted with incurable diseases, or the destruction of buildings as the only practicable method of staying the spread of a conflagration, or of bedding used in caring for persons affected with serious contagious diseases, where fumigation or some other comparatively inexpensive method of removing the dangerous germs from the articles is not practicable; the prevention of the pollution of water supply, the regulation of the construction or arrangement and care of buildings, especially in cities or where large numbers of persons are wont to congregate, to avoid very serious dangers which experience shows would otherwise exist; dangers so serious as to challenge the attention of any one of ordinary intelligence conversant with such matters. As said in *Lawton v. Steele,* 152 U. S. 133, 137, 14 Sup. Ct. 499, 501:

"To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals."

To the same effect are: *In re Wilshire,* 103 Fed. 620; *Toledo, W. & W. R. Co. v. Jacksonville,* 67 Ill. 37; *Ritchie v. People,* 155 Ill. 98, 40 N. E. 454; *Ruhstrat v. People,* 185 Ill. 133, 57 N. E. 41; *Bessette v. People,* 193 Ill. 334, 62 N. E. 215; *In re Jacobs,* 98 N. Y. 98; *Health Dept. v. Trinity Church,* 145 N. Y. 32, 39 N. E. 833; *C., B. & Q. R. Co. v. State ex rel. Omaha,* 47 Neb. 549, 66 N. W. 624.

Controlling significance should be attached to the words above quoted, "the interests of the public generally," etc., "require such interference." Not that some individuals now and then, or even generally, demand it, or require it, but that the interests of the people generally require it. In other words, that it is reasonably essential or necessary to such interests that the subject thereof should be dealt with by the legislature.

Further discussion on this subject might be indulged in at great length, which, though it might be interesting, would not be necessary or perhaps helpful in the decision of this or future cases.

The inquiries to be solved in testing an enactment purporting to be for the promotion of the public health as to whether it is fairly within the field of police power are well stated at sec. 143, Freund, Police Power, thus:

"Does a danger exist? Is it of sufficient magnitude? Does it concern the public? Does the proposed measure tend to remove it? Is the restraint or requirement in proportion to the danger? Is it possible to secure the object sought without impairing essential rights and principles?"

The judgment of the legislature, of course, as to all of them is to be taken as correct, unless it appear to be clearly wrong, and also it is to be taken as true that its ostensible is its actual purpose, unless the contrary clearly appears.

Now how is it with sleeping-cars, as regards whether the upper berths are open or closed when the lower ones are occupied, respecting any substantial danger, inconvenience, or discomfort to persons generally patronizing such utilities; danger sufficient to challenge attention as one reasonably requiring for the public interests a remedy? Persons so circumstanced as a rule, we apprehend, are so indifferent as to whether the upper berth is closed or not that they would not seriously think of having it closed at their expense or to the extent of even a small sum. Many probably would prefer to have it open if they were permitted to deposit some of their belongings therein in case of its not being otherwise occupied, which is commonly allowed. That is recognized in the law itself. Had it been thought that there is a substantial reason why, in the public interests, an upper berth should be closed when unoccupied, in case of the lower one being in use, the law would have so provided in all cases, instead of leaving it to the mere dictation, whether springing from

judgment or mere whim, of each individual customer for a lower berth, to control the upper one, in respect to the matter. To thus leave such matter to the mere caprice of the occupant of the lower berth is a confession on the face of the act that it was not treated by the legislature as one deemed to be reasonably vital to the public interests. So the law is not, in reality, a police regulation but an unwarranted interference with property rights; an attempt in the circumstances specified to give to any person, at his option, who pays for a part of a section in a sleeping-car the use, free of charge, of the balance thereof; an obvious, though well meant, attempt, it would seem, through mistaken notions of legislative power, to appropriate the property of one for the benefit of another in violation of several constitutional safeguards that might be referred to, but particularly the guarantee that "no person shall be . . . deprived of life, liberty, or property without due process of law," and the further guarantee that "private property shall not be taken for public use without just compensation therefor," and the safeguard springing from the whole constitutional system that private property shall not be taken at all for private use, except in the enforcement of obligations *inter partes*. In the foregoing it is not intended to foreclose the question of whether the scope of police power extends to preventing, as a rule, the letting down of upper berths in sleeping-cars when not occupied or engaged, in cases where the lower ones are occupied.

The proposition as to whether, if it were legitimate under the police power, in the interests of public health and comfort, to burden the business of operating sleeping-cars with a regulation giving an occupant of a lower berth dominion over the upper one, it is reasonable to do so in the manner provided, need not necessarily be treated, especially since it is incidentally involved and fairly covered in what has been said. Therefore, we will rest the case without much further discussion.

As we have seen, legislative interference with property or other private rights for the ostensible purpose of promoting public health and comfort, or both, to be valid must be adapted to that end, not merely to make effective mere individual dictation. It must neither deal with a matter not in reason forming a proper subject for police regulation, nor deal with a proper subject therefor by means which are clearly unreasonable for the accomplishment of the purpose nor which are oppressive. *Lawton v. Steele,* 152 U. S. 133, 137, 14 Sup. Ct. 499. So, courts have held the law may properly provide for the summary destruction of property which is of little value and being illegally used, while one for such destruction of property of considerable value for proper use, the annihilation thereof not being necessary to remedy the improper use, would be invalid. *Lawton v. Steele, supra.* A house may not be lawfully torn down because of its use for an unlawful purpose. *Ely v. Niagara Co.* 36 N. Y. 297. A regulation requiring a railroad to keep a flagman at every crossing, regardless of the amount of traffic and the degree of danger, is invalid upon the ground of unreasonableness. *Toledo, W. & W. R. Co. v. Jacksonville,* 67 Ill. 37.

In general, as before shown, all police regulations must bear the judicial test of reasonableness under all the circumstances. This doctrine is being more and more emphasized as the number of police regulations multiply, evincing a tendency to fence in individual freedom as to matters not formerly so narrowed by legislative enactments. The writers declare that the supervision which courts widely exercise regarding the adjustment of means to ends in the protection of public interests as to ordinances extends to legislative enactments as to health and safety. Freund, Police Power, § 142. Illustrative of that it is said in *Plessy v. Ferguson,* 163 U. S. 537, 16 Sup. Ct. 1138, that every legislative exercise of the police power must be reasonable, and in *Rideout v. Knox,* 148 Mass. 368, 19 N. E. 390, that reasonableness is one of the inherent limitations of such power.

In the foregoing it is not intended, even impliedly, to make any suggestion as to the wisdom of the increase of police regulations mentioned. That is beyond our functions. We only point to such increase as a circumstance which has aroused into greater activity and significance than formerly was apparent the judicial power of supervision which was intrenched in the constitution to prevent excesses.

It follows that an arbitrary appropriation in the name of law of the space of an upper berth in a sleeping-car for the greater comfort and safety, as regards the health of the occupant of the lower berth, at his option, if such use of such space were reasonably necessary, is highly oppressive. A regulation under the police power securing such privilege, in case of the upper berth not being engaged, by paying for it, would present a different question.

The learned deputy attorney general suggests that the law in question was borrowed from the state of New Hampshire, where it was adopted in 1883 (sec. 2, ch. 40, Laws of 1883; Pub. St. N. H. 1901, ch. 160, sec. 11). We are unable to find its validity to have been passed upon in that state. In any event, in our judgment, it is clearly unconstitutional, both because the subject as dealt with is not within the scope of police power, but is a mere matter, as to the persons sought to be benefited, of individual concern, and because if it were otherwise the character of the remedy, under the circumstances, is not within the boundaries of reason and so is an interference with constitutional rights of property.

*By the Court.*—The question submitted for decision in the first case is answered in the negative, and the same question submitted in the second case is likewise answered.

TIMLIN, J. I concur in the result upon the ground that the act in question constitutes such a restriction upon the ordinary use of property and such an interference with the dominion of the owner over his property as to bring it within the inhibition of secs. 9 and 13, art. I, Const., as interpreted

in *Janesville v. Carpenter,* 77 Wis. 288, 46 N. W. 128, and cases there cited.    Consequently it could only be justified as a valid exercise of the police power of the state.    But I consider the act in question not a valid exercise of the police power, because committing to the discretion of the occupant of the lower berth the matter of compelling either the raising or the lowering of the upper berth negatives the idea that the law is based upon considerations of public health, peace, morals, or safety.    So far as anything in the opinion of the court may be fairly understood to imply that the regulation of sleeping-cars is not within the field of police power or to imply that this court has any power to declare void an act of the legislature which does not conflict with some express provision or reasonable implication of the constitution, and merely because the act is (1) in the opinion of the court unreasonable, and (2) a police regulation, I desire to record my dissent therefrom