THE STATE EX REL. RISCH, Appellant, vs. BOARD OF TRUST-
EES OF THE POLICEMEN'S PENSION FUND, Respondent.

*February 25—March 22, 1904.*

*Appeal: Review of intermediate orders:* Mandamus: *Pensions to
policemen: Vested rights in fund: Constitutional law: Classifi-
cation of cities: Amending charters: Costs:* Mandamus *proceed-
ing is "action."*

1. Where the question to be determined and the judgment in a
   *mandamus* action would have been the same whether the case
   was submitted pursuant to a stipulation or upon a motion to
   quash the alternative writ, and the judgment of dismissal was
   in fact based upon the granting of said motion, an intermediate
   order striking out the stipulation is not reviewable on appeal
   from the judgment, because it is not an "order which involves
   the merits and necessarily affects the judgment," within the
   meaning of sec. 3070, Stats. 1898.

2. Continuance of a policeman in the service of a city after the
   enactment of a statute providing for a pension to his widow
   in case of his death while in such service, does not create any
   contractual or vested right, with reference to such pension,
   which cannot be taken away by subsequent legislation.

3. Where a statute in form requires police officers to pay certain
   sums per month out of their salaries into a pension fund, but
   in fact such sums are merely set apart by the city for said
   fund and the salaries actually paid to the officers are reduced
   accordingly, the moneys going into said fund do not at any
   time cease to be public moneys, and a police officer does not
   acquire any contractual or vested rights in respect to such
   fund prior to the happening of the particular event upon
   which the pension in his case becomes payable.

4. Ch. 265, Laws of 1899, "an act to create a pension fund for mem-
   bers of police departments in cities of the first class," ex-
   pressly provided that its provisions should "be amendatory of
   the charter of all cities of the first class in this state contain-
   ing a population exceeding 150,000;" and all conflicting pro-
   visions in such charters or any other law were repealed. Mil-
   waukee was the only such city in the state. *Held,* that the
   manifest legislative intention was to amend the Milwaukee
   city charter, and that the new act should be exclusive, super-
   seding and repealing prior acts (ch. 287, Laws of 1891, and
   ch. 379, Laws of 1895) on the same subject.

5. To the four rules stated in *Johnson v. Milwaukee*, 88 Wis. 383,. relative to the essentials of a constitutional classification of cities for purposes of general legislation, should be added a fifth, to the effect that the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation.

6. Such rules do not furnish a certain test by which the constitutionality of a legislative class may be determined, but the particular facts of each particular situation must necessarily be considered, it being kept in mind that the necessity and propriety for classification are primarily legislative questions.

7. The fact that, at the time of a particular enactment applicable to a class of cities, there is but one member of such class does not militate against the validity of the legislation.

8. Where cities have been classified on the basis of population, a. subdivision of the first class into those having and those not having a paid police department, by an act providing for a pension fund for police officers in those having such paid department,—that feature being made the basis, in the main, of the accumulation of the fund,—is not invalid.

9.· Ch. 265, Laws of 1899, was intended to apply to cities of the first class as they existed under sec. 925—1, Stats. 1898, it being clear, when secs. 1 and 17 of the act are read together, that the term "population exceeding 150,000" in sec. 17 was used by inadvertence instead of "population of 150,000 or over."

10. Although the constitution (secs. 31, 32, art. IV) has prohibited certain species of special legislation, including that for the enactment or amendment of city charters, and commanded the enactment of general laws enabling the prohibited matters to be done without direct legislative action, such method is not exclusive, and the power to legislate generally, directly affecting such matters, is the same as before.

11. The right to recover costs in an action or other judicial proceeding depends upon the statute.

12. Though not commenced by the service of a summons as provided in sec. 2629, Stats. 1898, a *mandamus* proceeding (commenced by service of the writ) is a "civil action" within the meaning of sec. 2595, and an "action" within the meaning of secs. 2918; 2920, relating to costs.

APPEAL from a judgment of the circuit court for Milwaukee county: WARREN D. TARRANT, Circuit Judge. *Affirmed.*
*Mandamus* action to compel the *Board of Trustees of the*

*Policemen's Pension Fund,* of the city of Milwaukee, to place the relator's name on the pension roll of the police department of said city as of the 20th day of April, 1900. The petition for the alternative writ stated that April 20, 1900, the relator's husband, William Risch, with whom she was then living, died, since which time she had remained his widow; that at the time of his death he was a policeman of said city in good standing and had been such continuously from May 4, 1886; that his compensation up to April 20, 1891, was $66.66 per month, and thereafter $80 per month and the prospective benefits guarantied by ch. 287, Laws of Wisconsin for 1891, which included the right, in case of his decease during his service for the city, of his widow to have her name placed upon the pension roll and to receive from the pension fund the sum of $30 per month; that since his death there had been ample money in the treasury of said board to pay the relator the pension stipulated in said law; that May 1, 1900, the relator demanded of the board a place upon the pension roll and payment of $30 per month as a pension from the date of her husband's death, which demand was refused, and that said board still adhered to such refusal.

On such relation an alternative writ of *mandamus* was issued and duly served upon the board. The city attorney of Milwaukee, assuming it was his duty to represent the board in the matter, duly served a notice of appearance upon relator's attorneys. The board, assuming that it was entitled to have an attorney in the matter of its own selection, duly employed Joseph B. Doe. The city attorney and the relator's attorney made a stipulation waiving all objections to the form and sufficiency of the petition upon which the alternative writ was issued, and of the writ, and agreeing to submit the matter involved to the court upon the law applicable thereto. The board, through its attorney, Mr. Doe, made due return to the writ. Later a motion was made by Mr. Doe, as such attorney, to quash the alternative writ and dis-

miss the proceedings leading up to the same, with costs, upon
the ground, in part, that the allegations in the petition were
not sufficient to entitle the relator to the relief sought. The
city attorney filed a demurrer to the petition upon the same
ground. Thereafter the relator's attorneys, upon the peti-
tion, alternative writ, and stipulation aforesaid, moved the
court for a peremptory writ of *mandamus*. Thereupon an
order was entered striking out such stipulation, denying such
motion, and determining. that Mr. Doe was the only person
entitled to recognition as attorney for the board in the pro-
·ceedings. Thereafter the motion to quash the writ was heard
and granted, and judgment dismissing the proceedings with
costs accordingly entered.

*William F. Thiel,* counsel, and *W. A. Hayes,* for the re-
lator.

For the respondent there was a brief by *Joseph B. Doe,*
attorney, and *Hoyt, Doe, Umbreit & Olwell,* of counsel, and
oral argument by *Mr. Doe.*

MARSHALL, J. We are asked to review the intermediate
order striking out the stipulation entered into between ap-
pellant's counsel and the city attorney and determining that
respondent was entitled to an attorney of its own choosing.
The effect of the stipulation, if carried out, would have been
to submit the question of appellant's right to a pension to
the decision of the court on the facts stated in the petition.
The city attorney subsequently filed a demurrer which raised
the same question. The motion of the attorney employed by
respondent to quash the writ raised a like question. The de-
·cision of such motion in favor of respondent is the founda-
tion of the judgment complained of. Whether the case was
submitted to the court for decision according to the stipula-
tion or the demurrer, or on the motion, the result would nec-
essarily have been the same. Therefore, we cannot perceive
how the order sought to be reviewed, striking out the stipula-

tion, answers to the call, under sec. 3070, Stats. 1898, for
"an intermediate order which involves the merits and nec-
essarily affects the judgment." For that reason it does not
seem to be necessary, nor strictly proper, to decide whether
it was right or not.

It is suggested by appellant's counsel that her right to the
pension under ch. 287, Laws of 1891, became fixed by. the
circumstance that her husband died in the service of the city
as a policeman after such law became operative, leaving a
widow. Sec. 8 of such law provides that:

"If any member of such fire or police department shall,
while in the performance of his duty, be killed, or die as the
result of an injury received in the line of his duty or of any
disease contracted by reason of his occupation, or if any mem-
ber of such fire or police department shall while, in said serv-
ice, die from any cause, . . . and shall leave a widow
. . . surviving, said board of trustees shall direct the pay-
ment from said pension fund" of $30 per month to such
widow while she remains unmarried.

There are some other conditions mentioned in the section,
which do not need attention.

The idea advanced by counsel is that, by the continuance
of appellant's husband in the service of the city as a police-
man after the act of 1891 took effect, contractual relations
with reference to the pension fund were created between him
and the city or the pension board which could not be dis-
turbed by any legislative enactment without violating his
constitutional rights. We do not understand that there are
any such relations between a municipality and its officers. In
the absence of some constitutional limitation upon the right
of the legislature to change such relations—and there is none
in this state—they are wholly under legislative control. The
compensation of municipal officers or their terms of office
can be changed, or the office can be abolished altogether. The

law on the subject is well stated in 23 Am. & Eng. Ency. of Law, 228, thus:

"It is well settled in the United States that an office is not the property of the office holder, but is a public trust or agency; that it is not held by contract or grant; that the officer has no vested right therein; and that, subject to constitutional restrictions, the office may be vacated or abolished, the duties thereof changed, and the term and compensation increased or diminished."

The same doctrine was declared and applied early in this state in *State v. Douglas,* 26 Wis. 428.

The suggestion is made that, independently of the rule above stated, a right accrued to the relator by reason of her husband's having contributed out of his salary $2 per month to the pension fund. As suggested by respondent's counsel, the feature of the law in form requiring police officers to contribute to the pension fund $2 per month out of their salaries, found in ch. 265, Laws of 1899, is not found in the law of 1891, upon which appellant relies; but if it were otherwise, it does not seem that such feature would have the effect claimed therefor. While the law of 1899 and similar laws, in form, require the officers to pay a certain sum per month out of their salaries into the pension fund, they in fact are not required to do so. The contribution to the fund is made by the public out of public money. It is not first segregated from the public funds so as to become private property and then turned over to the control of the pension board, but is set aside from one public fund and turned over to another, regardless of the mere words of the law. The effect thereof is to scale down the salaries of the officers in form by so much as measures the contribution by each to the pension fund, but to really fix such salaries at the amount actually paid and to require the payment by the city into the pension fund of the amounts, per month, mentioned as being taken from the

salaries. Such amounts are no less public money after such payment than before. That would seem plain as an original proposition, but has received sanction by the highest authority, as suggested by respondent's counsel, in *Pennie v. Reis,* 80 Cal. 266, 22 Pac. 176, carried to the supreme court of the United States, and the decision there reported in 132 U. S. 464, 10 Sup. Ct. 149. A law of California similar to our law of 1899, as regards the feature now being considered, was involved. The same claim was made as that advanced here, that the contribution to the fund being required to be made by the officer out of his salary, he acquired contractual rights in the fund entitled to constitutional protection. The decision was otherwise, and that an enactment, during a policeman's term of office, changing the pension regulations to his detriment, was not a violation of his constitutional rights, because in point of fact no money was contributed by him out of his salary; that the contribution spoken of as taken from his salary was taken from money belonging to the public and retained in its possession for the creation of the fund, the amount paid to the police officer being his real salary. This language was used:

"Though called part of the officer's compensation, he never received it or controlled it, nor could he prevent its appropriation to the fund in question. He had no such power of disposition over it as always accompanies ownership of property.

"Being a fund raised in that way, it was entirely at the disposal of the government, until, by the happening of one of the events stated, . . . the right to the specific sum promised became vested in the officer or his representative. It requires no argument or citation of authorities to show, that in making a disposition of a fund of that character, previous to the happening of one of the events mentioned, the state impaired no absolute right of property in the police officer. The direction of the state, that the fund should be one for the benefit of the police officer or his representative, under certain conditions, was subject to change or revoca-

tion at any time, at the will of the legislature. . . . Until the particular event should happen upon which the money or a part of it was to be paid, there was no vested right in the officer to such payment. His interest in the fund was, until then, a mere expectancy created by the law, and liable to be revoked or destroyed by the same authority. The law of April 1, 1878, having been repealed before the death of the intestate, his expectancy became impossible of realization."

That seems to be decisive of every question raised upon this appeal necessary to be considered, except that of whether the law of 1891 was so modified or repealed by ch. 265, Laws of 1899, that circumstances did not exist as regards appellant, at the time of the death of her husband, answering to the calls of the later law.

There is hardly room for serious controversy but that ch. 265, Laws of 1899, was intended to cover the same subject as ch. 287, Laws of 1891, and ch. 379, Laws of 1895. Each provides for the creation of a pension fund for the benefit of policemen and their families, and the accumulation thereof to a considerable degree, at least, from the same source, to be disbursed, however, under different conditions. Two such funds derived largely from the same source for the same purpose would be too absurd to justify holding that such a system exists by legislative creation, if the law on the subject will admit of a construction that will avoid it.

The law of 1891 under which appellant claims, applied to all cities whose population exceeded 100,000 having a paid fire department. It was made, by express provision, amendatory of the charters of all cities containing a population exceeding 150,000. Ch. 312, Laws of 1893, made all cities containing a population of 150,000 or over cities of the first class. The law of 1895 was made applicable to any city having a population of 150,000 or over and a paid fire department. It expressly superseded the law of 1891 in cities of the first class, and provided for certain proceedings by the

board of trustees of the existing firemen's and policemen's pension fund, and that it should thereupon cease to exist. There was but one board then existing under the law of 1891. That was in the city of Milwaukee. There was then but one city of the first class in the state, and that was the city of Milwaukee. It follows as a necessary inference that the legislature intended by the law of 1895 to amend the city charter of such city. That is plainly manifest, satisfying sec. 4986, Stats. 1898. The law of 1899 in the first section was made applicable to all cities of the first class and in sec. 17 amendatory of all charters of cities of the first class containing a population exceeding 150,000; and all charter provisions as to such cities, and all other laws in conflict with the new act, were repealed. Thus it will be seen that the legislature was careful to make it plain that such new act, in cities of the first class, was intended to be exclusive. The first section, by necessary inference, refers, as to existing conditions, only to the city of Milwaukee. However, as a safeguard against any claim to the contrary, direct reference was made to the charters in all cities of the first class, and that was followed by language repealing all conflicting provisions, whether in such charters or otherwise.

We think the position of counsel for respondent, that the acts referred to were not intended to amend the city charter of Milwaukee, has no support. True, the city of Milwaukee was not referred to by name, but cities of the first class were, and Milwaukee was the only such city in the state. Therefore, in letter and spirit it must be said that the manifest legislative intention was to amend such city's charter.

Appellant's counsel confidently rely on this court's holding, as above indicated, respecting whether the purpose of the law of 1899 was to amend the city charter of Milwaukee, and insist that if such be its character it is void under the constitutional prohibition respecting the creation of cities or the amendment of city charters by special legislation.

Subd. 9, sec. 31, art. IV, Const. Wis. That cities may be classified according to needs that can reasonably be said to be special to each group and laws be enacted applicable to one of such classes without offending against the constitutional provision referred to, is well settled by the decisions in all states having a limitation upon legislative authority similar to the one under consideration. In *Wheeler v. Philadelphia,* 77 Pa. St. 338, 349, the court, discoursing on this subject, said:

"The power [of classification] existed at the time of the adoption of the constitution; it had been exercised by the legislature from the foundation of the government; it was incident to legislation, and its exercise was necessary to the promotion of the public welfare. The true question is, not whether classification is authorized by the terms of the constitution, but whether it is expressly prohibited."

That doctrine has received approval here on numerous occasions. *Johnson v. Milwaukee,* 88 Wis. 383, 60 N. W. 270; *Boyd v. Milwaukee,* 92 Wis. 456, 66 N. W. 603; *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018; *Adams v. Beloit,* 105 Wis. 363, 81 N. W. 869; *Wagner v. Milwaukee Co.* 112 Wis. 601, 88 N. W. 577; *Battles v. Doll,* 113 Wis. 357, 89 N. W. 187. We have no constitutional prohibition against the legislative classification of cities for the purposes of general legislation, therefore it has been uniformly held that power in that regard exists notwithstanding special legislation creating cities or amending city charters is not permitted. General legislation for cities is legislation for all or for a legitimate class thereof.

"It is not necessary, in order to make a law affecting municipal corporations a general law, that it should affect every city in the state. Cities may be classified, and, if the classification be proper, laws may be passed affecting only a single class, and such laws will be general laws, and uniform in their operation throughout the state, within the meaning of the constitution." *Adams v. Beloit, supra.*

54    SUPREME COURT OF WISCONSIN.    [MAR.

State ex rel. Risch v. Trustees, 121 Wis. 44.

The essentials of a constitutional classification have been stated over and over again. They were given in the form of rules in *Johnson v. Milwaukee,* thus: (1) All classification must be based upon substantial distinctions which make one class really different from another. (2) The classification adopted must be germane to the purpose of the law. (3) The classification must not be based upon existing circumstances only; it must not be so constituted as to preclude addition to the numbers included within a class. (4) To whatever class a law may belong, it must apply equally to each member thereof. Those rules have been restated on various occasions without any material change. They are very general; so much that way as not to furnish a very definite test. It would be well to add a fifth rule, to the effect that the characteristics of each class should be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation. That was well stated in *Nichols v. Walter,* 37 Minn. 264, 272, 33 N. W. 800, and subsequently several times approved, thus:

"The true practical limitation of the legislative power to classify is that the classification shall be based upon some apparent natural reason,—some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes as suggests the necessity or propriety of different legislation with respect to them."

With this additional rule we still do not have a certain test by which the constitutionality of a legislative class may be determined. The particular facts of each particular situation must necessarily be considered, it being kept in mind that the necessity and propriety for classification are primarily legislative questions, the judgment of the legislature not to be disturbed unless it shall clearly appear that the limits of its constitutional authority have been overstepped.

The prime distinction between cities, that has been regarded generally as calling for different legislative treatment, has regard to population. In *Adams v. Beloit* the circumstance that the constitutional amendment of 1892 left a large number of cities existing under special charters incapable of further legislative regulation by special enactment, was held to create a constitutional class composed of such cities. The same reasoning would justify such of those cities as are so circumstanced as regards population or other features as to require a code of laws substantially different from others being placed in a subclass. Cities of the type of the largest in the state before the constitutional amendment, were put in the first class. That condition has not changed. Legislation since the amendment applicable only to a single class of cities, the first as well as others, has been common and never condemned in any adjudication by this court, *Burnham v. Milwaukee* not being an exception. Similar legislation in other states has been likewise sustained.

It being established that there may be a constitutional class of cities for the purposes of general legislation, the fact that at the time of a particular enactment applicable thereto there is only one member thereof does not militate against the validity of the legislation. *Adams v. Beloit, supra.* A class, when formed, must have regard for the peculiar needs of such cities as presently do, or in the future may, satisfy the calls thereof. There may be no such city at the time of the creation of the class. Subsequently there may be many. Members may grow into the class and may drop out. The number thereof at any time does not cut any figure as regards the principles involved. The creation of a class on legitimate lines for the purposes of general legislation is one thing; the creation of a class for the purposes of a special enactment, as in *Burnham v. Milwaukee,* quite another thing. Again, the creation of a class of cities on legitimate lines for legitimate purposes is one thing, and the subdivision of such

class into different classes for legislation of a particular character, germane, however, to all members of the major class, is quite another thing, and differing also from a subclassification for the purposes of legislation to satisfy needs peculiar thereto. The law of 1899 referred to an existing class of cities created for the purpose of enabling the legislature to deal with them separately from all others; not to deal with them for a particular purpose, but for all purposes where legislation for a class was permissible at all. Applying the principles stated, it is difficult to see how such act can be condemned as unconstitutional.

Counsel cite many authorities to our attention to support their position, but none condemning the classification of cities for the purposes of general legislation primarily according to population, each class being distinct from all others so as to reasonably suggest a necessity for different legislative treatment, and condemning legislation for one of the classes so established, though in the particular matter other classes might well be dealt with in the same way. *Hibbard v. State ex rel. Ward,* 65 Ohio St. 574, 64 N. E. 109, to which counsel refer with confidence, deals with an enactment that was not designed ever to apply to but one city. The law was condemned for that reason, in conformity to the holding of this court in *Burnham v. Milwaukee.*

Counsel contend that the act of 1899 subdivided the cities of the first class into those having a paid police department and those not having such a department, thereby making a class not based on population, and for a particular species of legislation, hence that it violates the first and second of the rules heretofore stated, and the doctrine of *Verges v. Milwaukee Co.* 116 Wis. 191, 93 N. W. 44, suggesting that generally the primary distinction in classifying cities is difference in population. The primary distinction in the law under discussion is in population; so if that were essential, it is satisfied. The next distinction is in regard to the paid police department feature. That would seem to be such a

marked difference as to fully satisfy the calls for a real dis-
tinction between the members of one class and those of an-
other, since such feature is made the basis, in the main, for
the accumulation of the pension fund.

Further, it is said that the law does not apply even to all
cities of the first class having a paid police department; that
it is limited to all such having a population exceeding
150,000. Counsel refer to the language of sec. 17. It seems
quite clear that the legislature, by the use of the term "popu-
lation exceeding 150,000," intended to refer to cities of the
first class created by ch. 312, Laws of 1893, and incorporated
into sec. 925—1, Stats. 1898, but inadvertently used the
term "exceeding 150,000" instead of "150,000 or over."
Sec. 17, as before indicated, doubtless refers to the same
cities as sec. 1. By reading sec. 1 in connection with sec. 17,
it seems quite clear that both refer to cities of the first class
as they existed at the time of the enactment, and that it did
not make a subclass of cities of the first class, as regards popu-
lation.

Counsel suggests for our consideration the question of
whether, since the constitution prohibits certain species of
special legislation, including that for the enactment or
amendment of city charters, and commands the enactment
of general laws, enabling the prohibited matters to be done
without direct legislative action, such method is not ex-
clusive. We think that must be answered in the negative.
The legislature, within the limitations of the federal con-
stitution, is supreme except as otherwise provided in the
state constitution. That prohibits certain special legislation,
the prohibition being accompanied with a requirement for
an indirect general method of doing the things prohibited;
but power to legislate generally, directly effecting such mat-
ters, is the same as before.

The foregoing seems to render other points discussed in
the briefs of counsel unimportant. In our judgment the law
of 1899, as regards appellant, refers to the law of 1891, is

valid, and repeals it. As the circumstances of the death of appellant's husband were such as to entitle her to a pension under the law of 1899 only in case prior to his death he had served upon the police force of the city of Milwaukee fifteen years, and he had not so served, the respondent had no power to place her name upon the pension roll and the judgment complained of in that regard cannot be disturbed.

The point is made that the court erred in rendering a judgment for costs against appellant. The question of costs in *mandamus* actions was left in some doubt in *State ex rel. School Dist. v. Wolfrom,* 25 Wis. 468; *State ex rel. G. B. & M. R. Co. v. Jennings,* 56 Wis. 113, 14 N. W. 28, and *State ex rel. Buchanan v. Kellogg,* 95 Wis. 672, 70 N. W. 300. In the first case cited the court said:

"Costs for the proper fees and charges of officers and all necessary disbursements follow judgment, as a matter of course, in proceedings of this nature. They are taxable under the general provisions of statute, though, perhaps, not attorney's fees allowed to parties in civil actions."

Why costs of one character were allowable and not those of another was not suggested. Costs do not follow a judgment as a matter of course in proceedings of this nature, or any other, in the absence of some statute on the question. As has often been said, the right to reasonable costs in an action or other judicial proceeding is a creature of the statute, it not being understood that English statutes on the subject were a part of the common law adopted in this country. *Wis. Cent. R. Co. v. Kneale,* 79 Wis. 89, 48 N. W. 248; *In re Donges's Estate,* 103 Wis. 497, 79 N. W. 786. The court said, in *State ex rel. G. B. & M. R. Co. v. Jennings* and *State ex rel. Buchanan v. Kellogg, supra:*

"A proceeding by *mandamus* is essentially a suit, and when issue is joined by the return it becomes a civil action, within the meaning of the statutes, and as to the form and sufficiency of the several pleadings must be governed by the same rules which prevail in other civil actions."

The court used the quoted language in both cases with reference to the general character of *mandamus* actions respecting pleadings and proceedings. True, a *mandamus* proceeding is a suit, from the aspect of the old practice. The court so said in *State ex rel. Durner v. Huegin,* 110 Wis. 189, 224, 225, 85 N. W. 1046. But, strictly speaking, under our Code practice we have no such thing as "suits," although we commonly use that term. We have only actions and special proceedings. What were formerly denominated suits in equity and actions at law are now denominated "civil actions." If a *mandamus* proceeding is in any sense a suit, it partakes of the nature of an action. In the absence of some special statute declaring a particular proceeding to be an action, the supreme test is sec. 2595, Stats. 1898, which provides that an action is an ordinary proceeding in a court of justice, by which a party prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense. Sec. 2596, Id., provides that every other remedy is a special proceeding. True, sec. 2629 provides that an action shall be commenced by the service of a summons, and secs. 2630 and 2631 specify what the essentials and substantially what the form thereof shall be; and as such sections seem to refer back necessarily to sec. 2595, if we were not to look further it would appear that no proceeding could be denominated an action unless required to be commenced by a summons. The statute declares that there is no remedy under our system in any matter of a civil nature other than a civil action or a special proceeding. A *mandamus* proceeding is not, strictly speaking, a special proceeding, nor analogous thereto. In the latter there is nothing in the nature of a complaint and answer, with issues of law or fact, or both, to be tried as actions ordinarily are tried, as is the case in *mandamus.* Ch. 148, Stats. 1898. Therefore, the latter must be treated as an action in some respects under sec. 2595.

The grant of power to circuit courts to use writs of *habeas corpus* and *mandamus* among other common-law writs, contemplates their use for the purposes they were devoted to before the adoption of the Code, in the commencement of suits, within the broad meaning of that term, as said in *State ex rel. Durner v. Huegin*. This essential characteristic has not been and cannot be changed by any legislative enactment. Hence, though strictly speaking, as said in *State ex rel. Durner v. Huegin,* a suit or action commenced by the issuance of a writ of *mandamus* is not a civil action tested by secs. 2630 and 2631, Id., it is such within the broad meaning that must be given to sec. 2595. In harmony with that, commonly, under the Code, proceedings whereby the respondent is cited by writ of *certiorari, mandamus,* or *habeas corpus,* have been spoken of as actions and treated in most respects like actions commenced by summons. Therefore the service of a writ of *mandamus* must be deemed to all intents and purposes the commencement of an action. True, it takes that form more perfectly after a return to the writ than before; but if it must then be deemed an action, as said in *State ex rel. Buchanan v. Kellogg* and *State ex rel. G. B. & M. R. Co. v. Jennings, supra,* it follows logically, it seems, that the service of the writ is the commencement of the action, not the making of the return thereto.

The term "action" in the costs statutes, secs. 2918 and 2920, was evidently intended to be understood in the same sense as "action" in sec. 2595 as regards civil matters. The purpose thereof was to give to the prevailing party in any civil action costs, except as otherwise expressly provided. There is no provision otherwise as to actions of this kind. It follows that the court rightly granted costs to respondent as in ordinary actions, and that the judgment should be in all respects affirmed.

*By the Court.*—The judgment is affirmed.