MEHLOS, Appellant, vs. CITY OF MILWAUKEE and others, Respondents.

*March 18—April 9, 1914.*

*Constitutional law: Police power: Limitations: Municipal corporations: Regulation of public dances and dance halls: Authority, how given: "General welfare" clause in charter: Ordinances: Validity: Classification: Licenses: Granting, refusing, and revoking: Power of mayor not arbitrary: Powers of police officers.*

1. To be valid a police regulation must be reasonable. There must be reasonable ground for the police interference, the means adopted must be reasonable for the accomplishment of the

purpose in view, and the degree of interference must be within the boundaries of reason.

2. As a rule, fundamental limitations of regulations under the police power are found in the spirit of the constitution, not in its letter, but are as efficient as if clearly expressed.

3. Regulation within the constitutional scope of the police power makes constitutional guaranties efficient; and when an act of the legislature is said to be unconstitutional because unreasonable, the idea involved is that it impairs or destroys some inherent right instead of conserving it.

4. Public dances or dance halls, since they are liable to be characterized by disorderly conditions or lead to breaches of the peace or promote immorality, are proper subjects for police regulation.

5. The power to regulate such public dances and dance halls by requiring them to be licensed and to pay license fees need not be given to a city expressly and unmistakably. It is sufficient if general terms in the general welfare clause of the city charter show a reasonably clear purpose to clothe the municipality with such power.

6. The grant of discretionary power to the common council by sec. 3, ch. IV, Milwaukee Charter, to enact such ordinances "for the government and good order of the city— . . . for the suppression of vice—for the prevention of crime— . . . as they shall deem expedient," etc., plainly confers authority to legislate in respect to public dances and dance halls.

7. An ordinance requiring, among other things, that every public dance hall shall obtain a license annually; that no such license shall be issued until it shall be found that the hall complies with and conforms to all ordinances, health and fire regulations of the city, is properly ventilated and supplied with toilet conveniences, and is a safe and proper place for the purpose; that the license may be canceled for causes stated; and that no public dances or balls shall be held until after being reported to the mayor and approved by him, is reasonable and does not violate any of the guaranties of the federal constitution.

8. Nothing in the federal constitution exempts citizens of the United States from reasonable police regulations as regards person and property, or prevents legitimate classification for the purpose of police regulation.

9. Classification for purposes of police regulation cannot ordinarily be made with such exactness that all the dangers to be guarded against will be found within the boundaries of the class to which the regulation is made to apply. All that is required is that there must be, in general, some reasonable

Mehlos v. Milwaukee, 156 Wis. 591.

basis on general lines for the division; and all reasonable doubts are to be resolved in its favor.

10. The fact that many of the things which an ordinance regulating public dances and dance halls was designed to guard against may occur as well at a dance where patrons attend by invitation, and that other dances may be held at places and under conditions quite similar to those of such public dances as are within the ordinance, does not render the classification illegitimate or the ordinance void.

11. Where, under such an ordinance, the mayor must refer all applications for dance-hall licenses to the chief of police for an investigation as to whether the place satisfies all the requirements of the ordinance, and such officer may call to his assistance three other city officials, and must make a written report to the mayor accompanied by his opinion as to whether the application should be granted or refused, the ordinance cannot be held void on the ground that it clothes the mayor with arbitrary power to grant or refuse the license.

12. Nor is such an ordinance rendered void by the fact that power to revoke the license is lodged with the mayor, where the grounds of revocation are clearly specified and the ordinance clearly, by implication, provides that the mayor in performing his duties shall proceed as a *quasi*-judicial tribunal.

13. A provision in such an ordinance giving authority to certain police officials to put an end, summarily and without a hearing, to a public dance in case of the violation of the ordinance, the commission of any indecent act, or the happening of any disorder of a gross, violent, or vulgar character, is a reasonably necessary and a proper provision.

APPEAL from an order of the circuit court for Milwaukee county: J. C. LUDWIG, Circuit Judge. *Affirmed.*

Action to restrain enforcement of a city ordinance upon the ground of its being unconstitutional. The following is such ordinance:

"Section 1. The term 'public dance' or 'public ball,' as used in this ordinance, shall be taken to mean any dance or ball to which admission can be had by payment of a fee or by the purchase, possession or presentation of a ticket or token in which a charge is made for caring for clothing or other property or any other dance to which the public generally may gain admission with or without payment of a fee. The term 'public dance hall' as used herein, shall be taken to mean any

room, place or space in which a public dance or public ball may be held, or hall or academy in which classes in dancing are held and instruction in dancing given for hire.

"Sec. 2. It shall be unlawful to hold any public dance or public ball or to hold classes in dancing within the limits of the city of *Milwaukee* until the dance hall in which the same may be held shall first have been duly licensed for such purpose. The application for such license shall be granted in the same manner as providing for the issuing of licenses under chapter 27 of the General Ordinances of the city of *Milwaukee*.

"Each license granted hereunder shall expire on the first day of July of each year and the license shall be posted in a conspicuous place within the hall in which the dance is held.

"The annual license fee shall be five (5) dollars. This ordinance shall be printed in full upon each license issued, and each license shall by its terms be made subject to revocation, as hereinafter provided.

"Sec. 3. No license for a public dance hall shall be issued until it shall be found that such hall complies with and conforms to all ordinances, health and fire regulations of the city; that it is properly .ventilated and supplied with sufficient toilet conveniences and is a safe and proper place for the purpose for which it is to be used.

"Sec. 4. The license of any public dance hall shall be forfeited or revoked by the mayor for disorderly or immoral conduct on the premises or for the violation of any of the rules, regulations, ordinances and laws governing or applying to public dance halls or public dances. If at any time the license of a public dance hall shall be forfeited or revoked, at least six months shall elapse before another license or permit shall be given for dancing on the same premises.

"Sec. 5. Every licensed owner of a dance hall shall, immediately upon application being received by him from any person, club or society to lease or rent his hall for the purpose of holding a public dance or ball therein, report to the mayor of the city of *Milwaukee* the name and address of such person, club or society, and the date when such public dance or ball is proposed to be held. The mayor shall at once make, or cause to be made, an investigation for the purpose of determining whether such dance or ball shall be held. If the mayor shall determine that the proposed dance or ball ought·

not to be held, he shall, within five (5) days after receipt of the aforesaid notice of application for lease or rental, notify the licensed owner of such dance hall, in writing, that the proposed public dance or ball shall not be held therein, and the licensed owner of such dance hall shall thereupon refuse to permit such public dance or ball to be held in such hall. Failure on the part of the licensed owner of such hall to comply with the provisions of this section shall be sufficient cause for the revocation of the license of such licensed owner.

"Sec. 6. All public dance halls shall be kept at all times in a clean, healthful and sanitary condition, and all stairways and outer passages and all rooms connected with a dance hall shall be kept open and well lighted. The chief of police, a captain, a lieutenant, or a sergeant of police, shall have the power, and it shall be their duty, to cause the place, hall or room where any dance or ball is held or given to be vacated whenever any provision of any ordinance with regard to public dances and public balls is being violated or whenever any indecent act shall be committed or when any disorder of a gross, violent or vulgar character shall take place.

"Sec. 7. It shall be unlawful after 10 o'clock p. m. to permit any person to attend or take part in any public dance who has not reached the age of eighteen (18) years, unless such person be in company with a parent or natural guardian. It shall be unlawful for any person to represent himself or herself to have reached the age of eighteen years in order to obtain admission to a public dance hall or to be permitted to remain therein when such person in fact is under eighteen years of age, and it shall also be unlawful for any person to represent himself or herself to be a parent or natural guardian of any person, in order that such person may obtain admission to a public dance hall, or shall be permitted to remain therein when the party making the representation is not in fact either a parent or natural guardian of the other person.

"Sec. 8. The mayor shall refer all applications for dance hall licenses to the chief of police, who shall investigate, or cause to be investigated, each application to determine whether the dance hall sought to be licensed complies with the regulations, ordinances and laws applicable thereto, and in the making of such investigation the chief of police shall, when desired, have the assistance of the building inspector, the commissioner of health and the chief of the fire department.

The chief of police shall furnish to the mayor in writing the information derived from such investigation, accompanied by a recommendation as to whether a license should be granted or refused. No license shall be renewed except after inspection of the premises as provided herein.

"Sec. 9. All public dances shall be discontinued and all public dance halls shall be closed on or before the hour of 3 o'clock a. m.

"Sec. 10. Any person, persons, society, club or corporation who shall violate the provisions of this ordinance shall, upon conviction thereof, be fined not less than twenty-five ($25) dollars, and the cost of prosecution and not more than one hundred ($100) dollars and the cost of prosecution for each and every offense, and on default of payment thereof shall be imprisoned in the house of correction, Milwaukee county, for a period of not exceeding ninety (90) days."

The complaint contained appropriate allegations as to plaintiff being especially injured by the ordinance and challenged its validity.

The appeal is from a decision dissolving a temporary injunction. Such decision turned on whether the ordinance was valid.

For the appellant there was a brief by *Rubin & Zabel,* attorneys, and *Horace B. Walmsley,* of counsel, and oral argument by *W. C. Zabel.*

For the respondents there was a brief by *Daniel W. Hoan,* city attorney, and *E. L. McIntyre,* assistant city attorney, and oral argument by *Mr. McIntyre.*

MARSHALL, J. These are the basic propositions to be considered: Is the maintenance of public dance halls a proper subject for police regulation? Does the city of *Milwaukee* possess authority in respect to such matter? Are the means adopted legitimate?

The general nature of the police power has been too often defined to leave room for anything further to be said of a strictly original nature. This court dealt, generally, with the matter in the following and other cases: *State ex rel. Adams*

*v. Burdge,* 95 Wis. 390, 70 N. W. 347; *State ex rel. Winkler v. Benzenberg,* 101 Wis. 172, 175, 76 N. W. 345; *State ex rel. Milwaukee Med. Coll. v. Chittenden,* 127 Wis. 468, 519, 107 N. W. 500; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W. 885.

Notwithstanding mere reiteration is unnecessary and attempts to improve on what has gone before seem futile, we do well to follow that wise constitutional admonition:

"The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."   Sec. 22, art. I, Const.

That is more than a mere admonition voicing in another way the thought often expressed as "Eternal vigilance is the price of liberty."   It is a declaration giving emphasis to the declared purpose of the fundamental law as involving restraint of anything in legislation invading inherent rights,—that freedom for which we are "Thankful to Almighty God" and for the conservation of which and security of "the blessings" for which, "governments are instituted among men, deriving their just powers from the consent of the governed." It points to the very vitals of the fundamental law and pictographs its spirit, making it visible to, and its beneficence appreciable by the commonest understandings.

It were better, perhaps, to speak of exercisable police power in the collective sense,—as that broad conception involved in the expression: It is the sovereign authority exercisable directly, where not expressly or inferentially prohibited, and otherwise, where not so prohibited, to pass laws regulating, reasonably, all those things which appertain to the public welfare.

Things may be within the police power, in the general sense, and not in the legal sense because expressly prohibited. Many things fall within such general sense which do not within the legal sense because impliedly prohibited.   The heresy which once had some believers, that it is a power

above fundamental restraints, has been so completely exposed as to only now exist as a matter of history, which more ex-cites our curiosity as to its origin and how the idea could have originated, in the light of any worth-while appreciation of our constitutional liberty, than challenges attention to any reason for a legitimate basis therefor. True, it is a great power. Without it the purpose of civil government could not be attained. It has more to do with the well-being of society than any other power. Properly exercised, it is a crowning beneficence. Improperly exercised it would make of sovereign will a destructive despot, superseding and ren-dering innocuous some of the most cherished principles of constitutional freedom. So it is said in *State v. Redmon,* 134 Wis. 89, 114 N. W. 137: "It may be extended disas-trously, or restrained and administered beneficially, according as the judiciary shall perform its constitutional functions. Confined within its legitimate field of reasonable regulation it is essential . . . to the full accomplishment of the pur-poses of civil government."

Too much significance cannot be given to the word "rea-sonable" in considering the scope of the police power in a constitutional sense. It took much time, notwithstanding clear declarations, over and over again, on the subject here and by the federal supreme and other courts (*Lawton v. Steele,* 152 U. S. 133, 137, 14 Sup. Ct. 499; *Plessy v. Fer-guson,* 163 U. S. 537, 16 Sup. Ct. 1138; *Rideout v. Knox,* 148 Mass. 368, 19 N. E. 390; and *Ely v. Niagara Co.* 36 N. Y. 297), for courts and text-writers, in general, to appreciate that the final evidentiary test of the legitimacy of a police regulation is whether it is reasonable under all the circum-stances. No court has been more emphatic on the subject than this. *State v. Redmon, supra; State ex rel. Milwau-kee v. Milwaukee E. R. & L. Co.* 144 Wis. 386, 397, 129 N. W. 623; *State ex rel. Adams v. Burdge,* 95 Wis. 390, 70 N. W. 347; *Bonnett v. Vallier,* 136 Wis. 193, 116 N. W.

885.   In the latter case the court deduced the following from
the many authorities in this and other courts:

"A police regulation must not extend beyond that reason-
able interference which tends to preserve and promote enjoy-
ment, generally, of those 'unalienable rights' with which 'all
men are endowed' and to secure which 'governments are
instituted among men.' . . . When it goes beyond the scope
indicated and enters into the domain of the destructive, it is
illegitimate and offends against some constitutional restraint,
express or implied, . . . ."

There must be reasonable ground for the police interfer-
ence and also the means adopted must be reasonable for the
accomplishment of the purpose in view.   So in all cases
where the interference affects property and goes beyond what
is a reasonable interference with private rights, it offends
against the general equality clauses of the constitution, it
offends against the spirit of the whole instrument, it offends
against the provision against taking property without due
process of law and against taking property for public use with-
out first rendering just compensation therefor.   So every po-
lice regulation must answer for its legitimacy at the bar of
reasonableness.

Some confusion at one time existed on the subject discussed
here because of expressions of judges as to a law or ordinance
being void for unreasonableness.   No provision could be
pointed to in state or national constitution limiting legislative
authority on that ground.

As a rule, fundamental limitations of regulations under the
police power are found in the spirit of the constitution, not
in its letter; but they are just as efficient as if expressed in the
clearest language.   As said before, the existence of the power,
itself, is presumed from very necessity therefor,—to the end
that the functions of government by, of, and for the people
may be efficiently exercised, but in the very reason for its ex-
istence is seen the respect due to its limitations.   The same

circumstances which imply the one imply the other.    There
we see the dignity of the term "reasonable" which has some-
times been omitted in describing the police power under our
constitutional system.

The confusion was created by failure to appreciate that,
by the use of such term, the characteristic of means was re-
ferred to, instead of the effect, while the latter is the real
mischief which infracts the constitutional restraints.

That is to say, the legislative effort at regulation, within
the police power, is not subject to condemnation, strictly
speaking, because unreasonable, but because it impairs or de-
stroys some inherent right instead of conserving it.    In re-
spect to inherent rights, all which conserves is reasonable;
that which impairs or destroys is unreasonable.    So when it
is said that an act of the legislature is unconstitutional be-
cause unreasonable, the idea involved is that the interference
with some inherent right is so great as to destructively affect
it and so violates its guaranteed inviolability.    Thus the con-
ception that regulation, within the constitutional scope of the
police power, makes efficient, constitutional guaranties in-
stead of impairing or destroying them, while outside such
scope the contrary is true.    State ex rel. Runge v. Anderson,
100 Wis. 523, 533, 534, 76 N. W. 482.

Now, given a proper subject for police regulation,—it be-
ing understood that whether a given matter is such is wholly
a judicial question, there is yet the field of appropriateness of
means.    Naturally, as the power is inherent in our system, of
necessity, there must be some reasonable basis for legislative
activity in respect to the matter dealt with, else the subject is
outside the scope of legislative interference.    However, given
a subject in respect to which there is some reasonable neces-
sity for regulation, fair doubt in respect thereto being re-
solved in favor of the affirmative, in case of the legislature
having so determined, the degree of exigency is a matter
wholly for its cognizance.

What is said as regards legitimacy of subjects for exercise of the police power may be repeated as to appropriateness of means; while given the two elements,—legitimacy of subject and appropriateness of means,—the degree of interference within the boundaries of reason is for the legislature to decide, there being left in the end the judicial power to determine whether the interference goes so far as to violate some guaranteed right,—regulate it so severely as to materially impair it, reasonable doubts being resolved in favor of legislative discretion.

With the elementary principles stated, in evidence, we may quickly reach the vital question upon this appeal. Public meetings and meeting places which are liable to be characterized by disorderly conditions or lead to breaches of the peace or promote immorality have, universally, been considered proper subjects for police regulation. Public dances and dance halls fall within the latter class. While, if conducted in a proper manner such a hall and its use may afford opportunity for innocent amusement, in the absence of any regulation, it tends to breed disorder, indolence, intemperance, immorality, and to otherwise lower the standard of people in the social state. Such places, conducted for gain, open, in general, to all who come in suitable order to be received, no other condition being exacted except the prescribed entertainment fee, are so liable to be centers of disturbance and character lowering or destruction, that they have been subjected to pretty severe regulation by statute and city ordinances, to preserve the possible benefits of such amusement places, and prevent the possible or probable abuses. They have been so regulated in Massachusetts by statute for many years. A violation of the law there is punishable much more severely than by the ordinance in question. Power is vested in administrative officers to determine the terms of the license and the terms and manner of its revocation. Neither legislative power is contemplated in the issuance of the li-

cense nor judicial power in the revocation,—only the discretion of the administrative officer, subject, of course, to answer in judicial remedies for any clearly unreasonable or arbitrary action.

Does the city of *Milwaukee* possess authority to legislate respecting the particular subject? It is conceded that, unless it was given such authority in its charter, it does not possess it.

True, as claimed, the power in question is only conferrable by language showing such purpose with reasonable clearness. The general principle in that regard, stated in *Chain Belt Co. v. Milwaukee,* 151 Wis. 188, 192, 193, 138 N. W. 621, is here reaffirmed. But that does not mean that such a power can be given only expressly and unmistakably. If general terms, in the general welfare clause, show a reasonably clear purpose to clothe the municipality with such power,—reasonable clearness being satisfied by a grant in clear terms covering a broad subject,—then the details subjects, within the entirety, are proper matters to be dealt with.

As said in *State ex rel. Elliott v. Kelly,* 154 Wis. 482, 143 N. W. 153, the general welfare feature of the city charter of the city of *Milwaukee* is very broad. It evinces a legislative purpose to afford the municipality the usual powers granted to cities of the kind. There is no rule requiring such a grant to be strictly construed so as to minimize its effect, rather the rule is that it should be construed, if construction be permissible and is needed, liberally to carry out the legislative purpose. Such purpose being plain, reasonable doubts as to the meaning of language used to effect it should be resolved in favor of the end the legislature clearly had in view.

Sec. 3, ch. IV, Charter of Milwaukee, page 54 (Compiled 1905), shows a grant of discretionary power to the common council to pass ordinances "for the government and good order of the city— . . . for the suppression of vice—for the prevention of crime— . . . as they shall deem expedient; and to declare and impose penalties, and to enforce the

same. . . ." The term for the "government and good order" of the city, by itself, is amply broad enough to cover the regulation of public places of amusement such as dance halls.    It is very comprehensive as used in city charters.    It covers the entire scope of reasonable police regulations to conserve the peace, the health, the safety, and the morals of the community, as will be seen by reference to 1 Dillon on Municipal Corporations (4th ed.) §§ 392 to 408 and notes.    This court has so viewed its scope.    *Ellinwood v. Reedsburg,* 91 Wis. 131, 64 N. W. 885.

-Thus far we have found that the particular subject is a legitimate field for regulation under the police power, and that authority in that regard was plainly conferred upon the city of *Milwaukee.*    We have now to see whether the means and extent of interference go beyond reasonable boundaries of conservation of the right to use property and to indulge in the amusements incident to public dances.

The plan of regulation is the usual one and the one contemplated by the charter.    Its general feature is the creation of a disability to use a hall for public dances except upon condition of a permit being first obtained therefor, based on satisfactory proof of the place being fit for such gatherings as regards health, convenience, and safety; such permit to be subject to cancellation in case of violation on the premises of good order or good morals or of any municipal regulation of such places, and subject to a duty to obtain public approval in advance of such intended use, to keep the hall and its accessories in a fit condition for such gatherings, and not to permit the use of the hall on any day later than 3 o'clock a. m. nor after 10 o'clock p. m. to allow any one to attend and participate in dancing who shall not have reached the age of eighteen years, unless accompanied by a parent or natural guardian, and to prevent, during any use of the premises for a public dance, any gross behavior of a disorderly, violent, or vulgar character.    Those detail features are common in such

ordinances and have never been held to be and, from an original standpoint, certainly are not unreasonable. They seem mild rather than harsh. The penalties for violation, as regards the proprietor at least, are not immoderate.

So it seems that if there is anything unreasonable in the ordinance it must be in matter of details of a strictly administrative character.

We may well observe, in passing, that the suggestion is made that the ordinance violates some of the equality guaranties of the federal constitution. There is no federal guaranty which exempts citizens of the United States from reasonable police regulations as regards person and property, *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 87 N. W. 561, or which prevents legitimate classification for the purpose of police regulation. In case of such classification and the regulation affecting all members of the class alike, there is no violation of any equality clause of national or state constitution. These principles are so well understood that it would be a waste of energy to discuss them. As the classification in this case,—halls used for public dances,—obviously satisfies all essentials on the subject of legitimacy, and, just as obviously, the restraints of the ordinance bear equally upon all members of the class, we need not spend much time with this branch of the case, which is argued at some length in the brief of counsel for appellant.

The fact that many of the things which the ordinance was designed to guard against may occur as well at a dance where patrons attend by invitation, and that dances may be held at places and under conditions quite similar to those of such public dances as are within the ordinance, is not fatal to the classification. It is generally the case that a classification cannot be made so as to make a definite line within which may be seen all the dangers to be guarded against and without which there are no such dangers. The best that can be done is to keep within the clearly reasonable and practicable.

That is accomplished where there are such general character-istics of the members of the class as to reasonably call for special legislative treatment. That may be true, generally, and yet some of such characteristics sometimes be found to exist outside of the boundaries of the class. Exactness in division is impossible and never looked for in applying the legal test. All that is required is that there must be, in gen-eral, some reasonable basis on general lines for the division, all reasonable doubts to be resolved in favor thereof. There ends the judicial and commences the legislative function, each being dominant in its particular field. *State ex rel. Kellogg v. Currens, supra; State ex rel. Risch v. Trustees,* 121 Wis. 44, 98 N. W. 954; *State v. Whitcom,* 122 Wis. 110, 99 N. W. 468; *Bingham v. Milwaukee Co.* 127 Wis. 344, 106 N. W. 1071; *State v. Evans,* 130 Wis. 381, 385, 110 N. W. 241.

We are unable to perceive why the principle declared and applied in those cases does not answer counsel's contention at this point. The authorities cited to support the theory of illegitimate classification do not seem to fit the situation in hand. So far as we are advised, public dance halls have com-monly been put in a class for the purpose of regulation and it has never been condemned.

On the subject of whether the administrative features of the ordinance are unduly severe, the main objection raised is in that the power is lodged in the mayor to refuse to issue a license and without assigning any reason therefor and without there being any standard fixed for him to go by nor any method for a review. The idea seems to be that this makes the owner of a hall which he desires to devote, in whole or in part, to use for public dances subject to the arbitrary will of the mayor.

Counsel misconceive the nature of the ordinance and the nature of the mayor's administrative duties. The ordinance, very distinctly, fixes a standard of fitness, so far as prac-ticable, without danger of undue harshness. From the very

nature of the case, minor details had to be made matter of administration by appropriate officials. The place is required to conform to all ordinances, health and fire regulations, to be properly ventilated and supplied with sufficient toilet conveniences and to be a safe and proper place for the purposes for which it is used. Why does that not set up a quite definite reasonable standard? Before granting a license the mayor is required to refer the application therefor to the chief of police for an investigation and report as to whether the place satisfies all the calls of the ordinance. The investigator is required to call to his assistance three officials of the city, viz. the building inspector, commissioner of health, and the chief of the fire department. After investigation with the help of such three expert assistants, the investigator is required to make a report in writing to the mayor, accompanied by his opinion as to whether the application should be granted or refused. That report the mayor is required to consider and pass judgment upon in coming to a conclusion.

In view of the foregoing, what foundation is there for the claim that the ordinance clothes the mayor with arbitrary power in the matter of passing upon an application for a license, affording .him opportunity, irremediably, to act upon his personal prejudice or mere caprice or some unworthy motive? It provides for a most careful, impartial, intelligent investigation by four city officials of high station, and contemplates that the mayor will honestly apply his judgment to the result. If he should refuse a license without doing so in the particular manner suggested, or refuse, under such circumstances as to clearly indicate the existence of some improper motive therefor, judicial remedies would be found ample to redress the wrong.

Power of a municipality to confer administrative authority on the mayor as in the ordinance in question, was upheld in *Milwaukee v. Ruplinger,* 155 Wis. 391, 145 N. W. 42. What was there said need not be repeated. We are unable to discover anything in the *Eubank Case,* 226 U. S. 137, 33 Sup.

Ct. 46, upon which appellant's counsel rely, out of harmony with this.

When it comes to the method ordained for revoking a license, though the power is lodged in the mayor, the grounds of revocation are clearly specified and, just as clearly, by implication, it is provided that the mayor shall proceed in the performance of his duties as a *quasi*-judicial tribunal.

There are several other details of the scheme of regulation, particularly, in respect to administrative features, which are urged should be looked upon as fatal, but we do not recognize any not the same or similar to those common to such police regulation and, generally, approved without even criticism. The authority of a police officer to put an end to a public dance upon the event of any provision of the ordinance being violated, or any indecent act being committed, or any disorder of a gross, violent, or vulgar character, is, we apprehend, common.

Complaint is made of conferring discretionary power upon the officials to act without any opportunity for any sort of a hearing. There is nothing novel about that, nor undue restraint upon liberty or property involved in it. It is a reasonably necessary provision, for the preservation of good order. It would be utterly useless to attempt to suppress such acts as that feature of the ordinance is designed to reach, if before action some sort of a judicial hearing were required. It must be remembered that the police power, as before indicated, is grounded on necessity. The basic reason for it renders details of dealing with a particular subject legitimate which are reasonable under all the circumstances, and are not expressly prohibited.

It is a mistake to suppose that a government by law contemplates law to protect one in liberty to do whatever he sees fit and do it as he sees fit. When we say, ours is a government by law and not by men, we mean that ours is a government based on rights with laws to preserve and conserve those rights, and men to administer those laws. There must

be the human element or there could be no administration. Without administration, law would have no vitality. Without law to preserve and conserve rights, vitalized by proper administration, there would be no rights and the very purpose for which governments are founded would fail of effectuation.

Other features of the ordinance to which our attention is called are as wanting in merit as those which have been discussed. They will be passed with the assurance that they have been considered with full appreciation of the nature of police regulations and their limitations; that the very existence of the power lies in the necessity for personal and property rights to be fenced about, to some extent, in order to be possessed beneficially,—really promote life and happiness,— and that freedom, under our constitutional system, means liberty to enjoy that which is inherent under such restraints as to repress that which is detrimental to a worth-while social state in order to conserve that which promotes and is necessary to it. Thus small limitations upon liberty of individual action are required,—are absolutely essential in order that rights, in the aggregate, may be possessed efficiently. The constitutional guaranty of their possession, constitutionally commands such exercise of the police power as is essential to preservation and conservation thereof. The degree of such exercise rests in legislative wisdom up to the point where it would be obviously operated to destroy instead of conserve. There comes in the constitutional bar. There is the respect which all men owe to it and for which all ought to bow to it. The lesson which needs most to be learned, is that liberty, under a popular government, contemplates many restraints; that such restraints are necessary to civil society, and that all must yield to them and appreciate that, within the limitations mentioned, in legislative wisdom rests the particular degree of restraint.

No more need be said in this case. It is presented with confidence and good faith, yet has no special merit. We

have not found it necessary or advisable to discuss the many authorities cited to our attention. It is easy to accumulate eloquent passages from legal opinions as regards sacredness of individual liberty. That could not well be too much exalted. Yet sometimes in picturing its significance respecting some particular condition, language is used which, if not restrained to such or similar conditions, would give rise to a very mischievous idea of what liberty, in a worth-while social state, means. When understood, the citations will not support anything out of harmony with what is said in this opinion. If it were otherwise, it would not change the result, because that rests on principles which cannot be changed by any concrete situation to which they may have been applied or any mode of expression in applying them.

*By the Court.*—The order is affirmed.